UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

--------------------------------------------------x
IN RE THE CITY OF NEW YORK      :

                            :           No. 10-237 op

          Petitioner,      :

--------------------------------------------------x
HACER DINLER, et al.          :    (SDNY 04 Civ. 7921)
MICHAEL SCHILLER, et al.    :    (SDNY 04 Civ. 7922)
DEIRDRE MacNAMARA, et al.  :    (SDNY 04 Civ. 9216)

                            :

         Plaintiffs-Respondents  :

           v.                :

                            :

THE CITY OF NEW YORK; RAYMOND  :
KELLY, Commissioner of New York
City Police Department, et al.,       :

                            :

         Defendants-Petitioners.  :
--------------------------------------------------x

# PLAINTIFFS-RESPONDENTS' OPPOSITION TO PETITION
## FOR WRIT OF MANDAMUS

CHRISTOPHER DUNN
ARTHUR EISENBERG
New York Civil Liberties Union
   Foundation
125 Broad Street, 19th Floor
New York, N.Y. 10004
(212) 607-3300

Counsel for *Dinler* and *Schiller*
   Plaintiffs-Respondents

Dated: April 8, 2010
      New York, N.Y.

JONATHAN C. MOORE
CLARE NORINS
Beldock Levine &
   Hoffman LLP
99 Park Avenue – 16th Floor
New York, New York 10016
(212) 490-0400

Counsel for *MacNamara* Plaintiffs-
   Respondents and Putative Class
   Members

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS AND OF THE CASE . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.    THE DISPUTED DOCUMENTS ARE CENTRAL
    TO THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.    <u>As Judge Sullivan Found, the Plaintiffs Have
          a Substantial Need for the Disputed Documents.</u> . . . . . . . . . . . . . . 13

    B.    <u>The City's Claims About the Relevance of the
          Documents Are Without Merit.</u> . . . . . . . . . . . . . . . . . . . . . . . . . 18

II.    THE CITY'S PETITION DOES NOT QUALIFY FOR
    EXTRAORDINARY MANDAMUS REVIEW BECAUSE
    IT PRESENTS NO IMPORTANT ISSUE
    OF FIRST IMPRESSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    A.    <u>The City's Petition Fails to Present Any Important
          Issue of First Impression.</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    B.    <u>The City's Claim that the Redactions and Protective
          Order Are Insufficient Presents No Issue for Mandamus
          Review and Is Without Merit.</u> . . . . . . . . . . . . . . . . . . . . . . . . . 29

III.    BY ASSERTING THE INTELLIGENCE OPERATION AS ITS
DEFENSE, THE CITY HAS WAIVED ANY CLAIM IT HAD
TO A PRIVILEGE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

IV.    THE CITY'S PETITION FAILS TO DEMONSTRATE THAT
JUDGE SULLIVAN ABUSED HIS DISCRETION UNDER
RULE 72 OF THE FEDERAL RULES OF CIVIL PROCEDURE . . . . . . 38

      A.    The Merits Section of the City's Petition Fails to Demonstrate
that Judge Sullivan Abused His Discretion. . . . . . . . . . . . . . . . . . 40

      B.    The City's Remaining Arguments Are Without Merit. . . . . . . . . . 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

EXHIBIT A:  Letter to Honorable James C. Francis IV from Assistant
                Corporation Counsel Gerald S. Smith (Feb. 21, 2007)

EXHIBIT B:  *Dinler v. City of New York*, 04 Civ. 7921,
                Unpublished Order (Nov. 28, 2007)

EXHIBIT C:  J. Miller, "When Activists Are Terrorists," *Wall Street
                Journal*, May 3, 2007

# TABLE OF AUTHORITIES

<u>Cases</u>

*American Express Warehousing, Ltd. v. Transamerica*
  *Insurance Co.*, 380 F.2d 277 (2d Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Fielding v. Tollaksen*, 510 F.3d 175 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 39

*Five Borough Bicycle Club v. City of New York*,
  2008 WL 704209 (S.D.N.Y., Mar. 10, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Erie County*, 473 F.3d 413 (2d Cir. 2007) . . . . . . . . . . . . . . 3, 24, 27-28, 29

*In re Grand Jury Proceedings John Doe Co.*,
  350 F.3d 299 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re "Agent Orange" Product Liability Litigation*,
  733 F.2d 10 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Sims*, 534 F.3d 117 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Steinhardt Partners, L.P.*, 9 F.3d 230 (2d Cir. 1993) . . . . . . . . . . . . . . . . . 28

*In re Von Bulow*, 828 F.2d 94 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re W.R. Grace & Co. – Conn.*, 984 F.2d 587 (2d Cir. 1993) . . . . . . . . . . . 26-27

*In re Weisman*, 835 F.2d 23 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*MacNamara v. City of New York*, 2009 WL 4789421
  (S.D.N.Y., Dec. 10, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*McNally Wellman Co. v. New York Electric & Gas Corp.*,
  63 F.3d 1188 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Schiller v. City of New York*, 2007 WL 735010 (S.D.N.Y., Mar. 12, 2007) . . . 7, 8

iv

*Schiller v. City of New York*, 2007 WL 1299260
 (S.D.N.Y., May 4, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Schiller v. City of New York*, 2007 WL 1461378
 (S.D.N.Y., May 18, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Schiller v. City of New York*, 2007 WL 1623108
 (S.D.N.Y., June 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Schiller v. City of New York*, 244 F.R.D. 273
 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 15, 41

*Schiller v. City of York*, 252 F.R.D. 204
 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13-14, 41

*Schiller v. City of New York*, 2008 WL 4933645
 (S.D.N.Y. Oct. 6, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tabbaa v. Chertoff* 509 F.3d 89 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) . . . . . . . . 3-4, 34-35, 37

*United States v. Nobles*, 422 U.S. 225 (1975) . . . . . . . . . . . . . . . . . . . . . . 4, 35-36

*Wilner v. National Security Agency*,
 592 F.3d 60 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Other Sources

J. Dwyer, "City Police Spied Broadly Before G.O.P. Convention,"
 *New York Times*, Mar. 25, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

J. Miller, "When Activists Are Terrorists," *Wall Street Journal*,
 May 3, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# PRELIMINARY STATEMENT

The mandamus petition before this Court presents an issue routinely confronted by district courts: the extent to which the law-enforcement privilege shields documents from discovery. More specifically, the petition attacks a ruling by Southern District Judge Richard J. Sullivan applying well-established and undisputed law governing the law-enforcement privilege and holding that the plaintiffs were entitled to obtain documents that had been substantially redacted to eliminate all confidential sources and techniques and that bear directly on what the defendants have represented will be their central defense in this matter.

Given the alarmist tenor of the City's petition, it is important to highlight two matters at the outset. First, it was the City -- over the plaintiffs' objections -- that inserted into these cases the intelligence operation that yielded the documents at issue in this mandamus petition. In these and dozens of other cases pending before Judge Sullivan, the plaintiffs challenge under the First Amendment and other grounds the mass arrest, prolonged detention, and blanket fingerprinting of hundreds of law-abiding people, including demonstrators, journalists, and bystanders, during the 2004 Republican National Convention. Three days before nearly two years of discovery was set to close in December 2006, the City came

1

forward and disclosed that it intended to defend the challenged actions by relying on information the New York City Police Department had collected during a previously-unknown operation it had run surveiling protest groups in anticipation of the Convention. The plaintiffs moved to preclude the City from introducing the operation into the case and only sought discovery about the operation after their motion to preclude was denied (with the lower court assessing attorneys' fees against the City for its last-minute disclosure). Thus, not only does the dispute about the intelligence documents exist only because the City created it, but the City is trying on the one hand to use the surveillance operation as its central defense while on the other hand invoking privilege to block discovery into information about the operation that would undermine that defense.

Next, nothing about Judge Sullivan's order threatens to imperil the lives of undercover officers or confidential informants. Judge Sullivan did not order the NYPD to disclose the identities of either, as the plaintiffs never sought any such information and with their consent all information about confidential sources and techniques has been ordered redacted from the NYPD documents. Under Judge Sullivan's ruling, the NYPD is only required to produce, under a strict protective order, information learned about the planned activities of the surveiled protest groups and the names of the groups. And the reason for this is simple: to allow the

2

plaintiffs to respond to the City's stated central defense that the information learned from the surveillance operation justifies as a matter of law the NYPD actions the plaintiffs challenge.

With this by way of background, the lack of merit to the City's petition is evident. First, this Court long has held that mandamus review of discovery orders involving privilege issues is available only in the most extraordinary of cases, with the specific requirement that the petition present "an important issue of first impression." *See, e.g., In re Erie County*, 473 F.3d 413, 416-17 (2d Cir. 2007). The City's petition fails to identify any such issue but instead simply contends that the specific facts of this case warrant mandamus review, which falls far short of the requisite standard. And the City's assertion that the redactions and protective order are insufficient to protect sensitive information that might be gleaned from the unredacted portions of the documents presents only a factual dispute and one that would require this Court to review the nearly 2,000 pages of documents and their voluminous redactions, which plainly is inappropriate for mandamus.

Second, by asserting the intelligence operation as a defense, the City has waived its privilege claim. Both this Court and the Supreme Court have held that a party cannot on the one hand assert a defense and then at the same time seek to invoke a privilege to withhold information bearing on that defense. *See United*

3

*States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991); *United States v. Nobles*, 422 U.S. 225 (1975).

Finally, even if mandamus were available and the City had not waived the privilege, it would have to demonstrate not just that Judge Sullivan erred but that he abused his discretion when he rejected the City's privilege claim. Though the City offers an array of arguments, by their terms they assert nothing more than that Judge Sullivan was wrong. Besides being without merit, the City's arguments on their face fall well short of the stringent requirement for mandamus relief.

## STATEMENT OF FACTS AND OF THE CASE

Because the facts offered by the City are incomplete and in some material respects misleading, the plaintiffs-respondents offer their own statement of the case. In doing so, they rely on findings in prior rulings in this case as well as on the factual record the parties submitted to Judge Sullivan in this dispute.

Represented by the New York Civil Liberties Union ("NYCLU"), the plaintiffs in the *Schiller* and *Dinler* cases are seven individuals -- four protesters, two bystanders, and one journalist -- who were swept up in two mass arrests -- one on Fulton Street near the World Trade Center and the other on East 16th Street near Union Square Park – during the Republican National Convention that took place

4

in New York City between August 31 and September 2, 2004. Though they were charged only with minor, noncriminal offenses -- all of which were dismissed -- the plaintiffs were not issued summons and released but instead held for prolonged periods of time and fingerprinted before eventually being released.

In early October 2004, they filed two suits (one for each mass arrest location) in the Southern District of New York alleging they were unlawfully arrested, unlawfully detained for prolonged periods of time, and unlawfully fingerprinted. *See* Complaint in *Schiller v. City of New York,* 04 Civ. 7922 (filed Oct. 7, 2004); Complaint in *Dinler v. City of New York,* 04 Civ. 7921 (filed Oct. 7, 2004).[1] Subsequent discovery revealed that for the Convention the NYPD adopted policies of denying summonses to "all RNC-related arrestees" (the "no-summons policy") and of fingerprinting all arrestees (the "blanket fingerprinting policy"). *See* Celeste Koeleveld Declaration in Support of Petition for Writ of Mandamus ¶ 23 (Jan. 22, 2010) (hereinafter "Petition").

After the NYCLU filed *Schiller* and *Dinler,* scores of other cases, including the companion *MacNamara* case, were filed in the Southern District on behalf of

---

[1]Because one of the bystander plaintiffs (Hacer Dinler) was taken directly to a hospital and ultimately released from there, she was not fingerprinted. *See* Dinler Complaint ¶¶ 34-37. Thus, only six of the seven plaintiffs have asserted the fingerprint claim.

others challenging NYPD actions during the Convention. All of those cases were consolidated with the *Schiller* case, all were assigned to a single District Court Judge and Magistrate Judge, and a consolidated discovery order was entered.

The twenty-four *MacNamara* plaintiffs, represented by Beldock Levine & Hoffman LLP, assert on behalf of themselves and a putative class of approximately 1200 Convention arrestees that the defendants instituted a system of mass arrests and preventative detention of protestors during the 2004 Republican National Convention. *See* Class Action Complaint in *MacNamara v. City of New York*, 04 Civ. 9216 (filed November 22, 2004, with subsequent amendments at Dkt Nos. 25 and 259). The *MacNamara* plaintiffs -- demonstrators, bystanders and one videographer -- were arrested at twelve locations in New York City during the week of the Convention, including the two arrest sites at issue in *Schiller* and *Dinler*. Like the overwhelming majority of Convention arrestees, plaintiffs were arrested for nonviolent, non-criminal offenses but were detained for extended periods of time, typically two nights, under conditions that plaintiffs also challenge as unconstitutional.

The *MacNamara* plaintiffs assert, on behalf of themselves and the putative class, that their unreasonably lengthy detention violated the Fourth Amendment. Further, because the City's no-summons and blanket fingerprinting policies, which

6

served to prolong plaintiffs' detention, applied expressly and solely to people arrested in the context of a Convention-related protest or demonstration, the *MacNamara* plaintiffs challenge the constitutionality of those policies under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

At the outset of discovery in *Schiller* and *Dinler*, the parties exchanged mandatory disclosures, with the City identifying a total of eight witnesses in the two cases. *See Schiller v. City of New York*, 2007 WL 735010, *1 (S.D.N.Y., Mar. 12, 2007) ("*Schiller Preclusion Ruling*") (describing City's mandatory disclosures). Discovery proceeded and, after various extensions, was scheduled to close 21 months later on December 15, 2006. Three days before the cut-off, however, the City supplemented its mandatory disclosures by identifying 130 new witnesses, one of whom was NYPD Deputy Commissioner for Intelligence David Cohen. *See id.* The City then produced to the plaintiffs approximately 600 pages of intelligence documents in response to a long-standing request for all documents providing justifications for the processing of persons arrested at Convention-related events. *See id.* at **1-2.

The City's listing of Deputy Commissioner Cohen and the production of the 600 pages of documents marked the introduction of the pre-Convention NYPD surveillance operation into this case. In response, the plaintiffs promptly moved to

7

preclude the City from relying on Deputy Commissioner Cohen or the documents in light of their last-minute disclosure. *See Schiller Preclusion Ruling*, 2007 WL 735010 at \*2. In opposing that motion, the City asserted that Deputy Commissioner Cohen's testimony about the surveillance operation would be central to its defense. *See* Letter to Honorable James C. Francis IV from Assistant Corporation Counsel Gerald S. Smith at 5 (Feb. 21, 2007) (attached as Exhibit A to back of this opposition). Given the City's representations about the role the operation would play in its defense, Judge Francis denied the plaintiffs' preclusion motion. *See Schiller Preclusion Ruling*, 2007 WL 735010 at \*4. Because of the City's breach of its disclosure obligations, however, he reopened discovery to allow the plaintiffs to discover information about the operation and imposed sanctions in the form of an order that the City pay all attorneys' fees and costs incurred in that additional discovery. *See id.* at \*5. The City did not appeal.

The plaintiffs then deposed Deputy Commissioner Cohen, who testified that the NYPD had run an intelligence operation before the Convention that focused on groups that intended to come to New York City to participate in protests. As Deputy Commissioner Cohen has explained (at the deposition and in later filings), the first stage of that operation consisted of a review of "on-line resources" (such as websites). That review generated the 600 pages of documents the City

8

produced in January 2007, which the NYPD refers to as "end-user reports." This initial stage of the operation generated a set of "leads" that prompted the NYPD, using undercover officers and confidential informants, to engage in a second stage that entailed direct surveillance of certain protest groups.[1]

Believing this direct surveillance likely generated documents beyond the 600 pages the City had produced, the plaintiffs immediately served a discovery request for such documents. *See Schiller v. City of New York*, 2007 WL 1461378 *2 (S.D.N.Y., May 18, 2007) (quoting request). The City objected on relevance and law-enforcement privilege grounds but did not (and never has) produced a privilege log. The plaintiffs moved to compel, and the City, relying on declarations submitted by Deputy Commissioner Cohen in June 2007 and May 2008, reiterated its relevance and law-enforcement privilege claims.

---

[1]*See* Deposition of David Cohen at 84, 88-90, 99, 107, 109, 115-122 (Mar. 28, 2007); *see* Petition ¶¶ 31, 26, 27 (describing categories of documents generated by Intelligence Division as part of operation, including end-user reports and "raw, unevaluated field intelligence reports, all of which were prepared by undercover police officers from the Intelligence Division."). *See generally Schiller v. City of New York*, 244 F.R.D. 273, 274-76 (S.D.N.Y. 2007) (reviewing facts of this dispute). Given that these facts are undisputed and in an effort not to burden the Court with excessive pages, the plaintiffs do not attach the relevant pages from the Cohen deposition. However, they were part of the record before the District Court and were attached as Exhibit B to the declaration submitted by the undersigned in conjunction with the City's motion for a stay pending disposition of the mandamus petition. *See* Declaration of Christopher Dunn in Opposition to Petitioner's Motion for Stay (Feb. 4, 2010).

9

In two separate rulings Magistrate Judge James C. Francis rejected the City's relevance objection and, in light of its privilege objections, ordered substantial redactions to the documents and ordered that they be produced subject to a strict protective order that allows the City to produce a single set of documents, which are to be held at the NYCLU's offices and which can only be viewed by plaintiffs' lawyers, with no further dissemination. *See Schiller v. City of New York*, 2007 WL 1461378 (S.D.N.Y., May 18, 2007) (Mandamus Appendix at 85-93) (relevance ruling); *Schiller v. City of New York*, 244 F.R.D. 273 (S.D.N.Y. 2007) (A154-75) (privilege ruling).

The City then filed objections under Rule 72 of the Federal Rules of Civil Procedure and requested, in conjunction with that appeal, that Judge Sullivan, who presides over all of the Convention litigation, allow it to file a third declaration from Deputy Commissioner Cohen. In an effort to give the City every possible opportunity to contest Judge Francis's ruling, Judge Sullivan remanded the matter back to Magistrate Francis with a directive that the City be allowed to file another declaration from Deputy Commissioner Cohen and that Magistrate Francis then reconsider his earlier law-enforcement privilege ruling in light of that new declaration. *See Dinler v. City of New York*, 04 Civ. 7921, Order (Nov. 28, 2007) (unpublished order attached as Exhibit B).

10

In August 2008, after the City filed the new declaration from Deputy Commissioner Cohen, Magistrate Francis revised his original privilege ruling, though he adhered to his basic conclusion that the City was required to produce redacted versions of the intelligence documents. *See Schiller v. City of York*, 252 F.R.D. 204 (S.D.N.Y. 2008) (A224-49). One month later, he ordered additional redactions at the City's request. *See Schiller v. City of New York*, 2008 WL 4933645 (S.D.N.Y. Oct. 6, 2008) (A250-54).

The City then appealed again to Judge Sullivan. Relying on the Cohen declarations, the City challenged Magistrate Francis's rulings that the intelligence documents were relevant and that any law-enforcement-privilege concerns were addressed by the redactions he authorized and the protective order he ordered. In a December 2009 opinion and order, Judge Sullivan rejected both arguments and affirmed Magistrate Francis's rulings. *See MacNamara v. City of New York*, 2009 WL 4789421 (S.D.N.Y., Dec. 10, 2009) (A386-392).

The City then filed its petition for a writ of mandamus. In response to an order from the Court, the plaintiffs-respondents file this opposition to that petition.

11

# ARGUMENT

In seeking to overturn Judge Sullivan's ruling, the City faces a formidable burden. As an initial matter, it must demonstrate, pursuant to well-established standards of this Court, that this is one of those rare cases in which mandamus is available to review a district court discovery order. Then, it must establish that Judge Sullivan committed a clear abuse of discretion.

The City's petition fails for three principal reasons. First, it does not qualify for mandamus review for the threshold reason that it does not present an important issue of first impression. *See* Part II. Beyond this, the City has waived any privilege claim it might have had by affirmatively asserting the intelligence operation as its defense. *See* Part III. Finally, nothing in the petition demonstrates that Judge Sullivan abused his discretion in concluding that the law-enforcement privilege did not entitle the City to withhold the disputed documents in light of the plaintiffs' substantial need for them, the extensive redactions, and the strict protective order. *See* Part IV. Before turning to the merits of the City's petition, however, the plaintiffs address in Part I the City's repeated assertion that the disputed documents are immaterial to these cases.

12

# I. THE DISPUTED DOCUMENTS ARE CENTRAL TO THESE CASES.

In its petition the City relies heavily on the assertion that the disputed intelligence documents are irrelevant to the issues being litigated in these cases. While a district court's determination about relevance for discovery purposes does not qualify for mandamus review, the relevance and nature of the disputed documents do bear on the City's privilege claim. For this reason, the plaintiffs first address the specifics of the disputed documents.

### A. <u>As Judge Sullivan Found, the Plaintiffs Have a Substantial Need for the Disputed Documents.</u>

The City never produced a privilege log, and its papers provide minimal information about the disputed documents. What is known is that they consist of an unspecified number of "field intelligence reports" prepared by undercover officers who surveiled protest groups, 84 "other documents" that were "prepared by the NYPD's Intelligence Division" but not otherwise described, and 177 additional documents also "prepared by the Intelligence Division" but not otherwise described. *See* Mandamus Petition ¶¶ 26-27; Declaration of Deputy Commissioner David Cohen ¶¶ 14, 34, 42 (April 30, 2008) (A181, A190, A193). These documents apparently total approximately 2,000 pages. *See Schiller v. City*

13

*of New York*, 252 F.R.D. 204, 213 n.20 (S.D.N.Y. 2008) (discussing redactions through page 1994) (relevant Slip Opinion page in Appendix at 247).

These documents are plainly central to the case, and the City's claims to the contrary are without merit. As noted above, the intelligence documents became an issue when the City first disclosed in December 2006 that it intended to rely on information gleaned from the NYPD's political surveillance operation to defend the mass arrests, prolonged detentions, and blanket fingerprinting being challenged by the plaintiffs. Recognizing that, in light of this disclosure, information obtained through the operation became relevant to the case, the City in January 2007 at its own initiative produced to the plaintiffs approximately 600 pages of intelligence documents.

The plaintiffs then deposed NYPD Deputy Commissioner David Cohen, whom the City had identified as the witness who would testify about the surveillance operation. In that deposition, Deputy Commissioner Cohen explained that the 600 pages that had been produced were collected at the first stage of the operation. More specifically, he explained that the Department first had attempted to collect information about Convention protest groups through "open sources" – mainly by reviewing materials on the Internet. The 600 pages of produced documents largely consisted of this Internet information. *See* Petition ¶ 32.

14

The NYPD used this information to identify protest groups it would surveil to obtain first-hand information about their Convention plans. The department in turn employed undercover police officers and confidential sources to monitor and report on the actual plans being made by the targeted groups. It was this process that produced the documents at issue before this Court. *See* Deposition of David Cohen at 84, 88-90, 99, 107, 109, 115-122 (Mar. 28, 2007); *see* Petition ¶¶ 31, 26, 27 (describing categories of documents generated by Intelligence Division as part of operation, including end-user reports and "raw, unevaluated field intelligence reports, all of which were prepared by undercover police officers from the Intelligence Division."). *See generally Schiller v. City of New York*, 244 F.R.D. 273, 274-76 (S.D.N.Y. 2007) (reviewing facts of this dispute).

As Judge Sullivan explained, the information collected from the on-line resources and from the disputed reports of direct surveillance was provided to Deputy Commissioner Cohen, who in turn conveyed that information to a group of high-level NYPD officials who considered the information in adopting the policies being challenged by the plaintiffs:

> The Intelligence Documents formed part of the overall threat assessment that Cohen delivered to members of the RNC Executive Committee, the body that ultimately generated the challenged arrest policies. Cohen stated that "[m]y staff discussed the information contained in the [documents] with me as it was being developed, and

15

I considered it as part of the body of information I analyzed on a continuing basis."

*MacNamara*, Slip Op. at 4 (A389) (quoting Declaration of David Cohen ¶ 13 (May 2, 2007)).

In opposing the plaintiffs' effort to preclude the City from relying on the intelligence operation in defending this case, the City emphasized the central role that information from the intelligence operation would play in the case:

> Plaintiffs have made clear on numerous occasions that two of their claims in these litigations revolve around the NYPD's decision to fingerprint all RNC-related arrestees and not to issue summonses to those arrestees. In addition, Plaintiffs allege that these policies were adopted to retaliate against and punish individuals for demonstrating during the RNC. The defenses against these claims will naturally involve explanations for the reasons why the policies in question were adopted. With regard to those explanations, the record in these matters reflects the fact that the decisions to adopt those policies were based in large part upon intelligence information that had been gathered regarding the number of individuals planning to attend the RNC in some capacity and the number of groups and individuals intending to, or at least professing to attend to, engage in unlawful behavior during the RNC. Moreover, as set forth, *supra*, Commissioner Cohen has been identified as being personally involved in the collection and presentation of that intelligence information to other NYPD officials. In fact, in some instances it may be that Commissioner Cohen was *the only individual* who delivered such briefings.

16

Letter to Magistrate Judge James C. Francis from Assistant Corporation Counsel

Gerald Smith at 5 (Feb. 21, 2007) (attached as Exhibit A) (citations omitted;

emphasis in original).

Given the City's contention that it would seek to establish that its actions

during the Convention were legally justified in light of information the NYPD had

collected about the plans of protest groups through its intelligence operation, the

plaintiffs -- through the document request that prompted this protracted discovery

dispute -- naturally asked the City to produce the information it had collected.

And the plaintiffs were particularly interested in the information gathered through

the part of the operation that entailed direct surveillance of protest groups, as that

information presumably would provide a far more accurate picture of protest plans

as compared to the earlier Internet postings gathered by the NYPD.

The significance of these reports is self-evident. As Judge Sullivan

explained,

> [T]o the extent that the documents reveal a threat that would have
> legally justified the City's challenged policies, they will support the
> City's defense; to the extent they do not, they will undercut that
> defense. . . .
> . . . Clearly, information indicating the NYPD's assessment of
> the involved groups and the anticipated turnout and likelihood of
> violence by such groups bears directly on whether the mass arrest
> policies were constitutionally justified.

17

*MacNamara*, Slip Op. at 4-5 (A389-90). <u>And to be clear, the plaintiffs believe these documents will substantially undermine the City's defense, as it is and always has been the plaintiffs' position that these reports will reveal that Convention protest groups did not plan to engage in the violent activity alleged by the NYPD and that the NYPD knew that as a result of the reports.</u>

Judge Sullivan was plainly correct in concluding the plaintiffs had a substantial need for the documents. Indeed, as discussed in Part III, the fact that the City has asserted the intelligence operation as a defense makes the documents so central to the case that the City has waived any privilege claim it might have in the documents. Before discussing that, however, the plaintiffs respond to the City's claims about the irrelevance of the documents.

B. <u>The City's Claims About the Relevance of the Documents</u>
<u>Are Without Merit.</u>

Notwithstanding Judge Sullivan's ruling to the contrary, the City claims the surveillance documents are wholly irrelevant. Specifically, it contends at various points in its petition that they are irrelevant because (1) the City does not intend to rely on them in defending against the plaintiffs' claims, *see* Petition ¶ 62; (2) the documents only "corroborate" the 600 pages already produced, *see id.* ¶ 65; (3)

18

Deputy Commissioner Cohen had not reviewed the documents themselves when he participated in the development of the challenged policies, *see id.* ¶ 31; (4) the plaintiffs have stated they do not intend to dispute the factual basis of the NYPD's threat assessment at the time of the Convention, *see id.* ¶ 67; and (5) the number of protest groups allegedly planning unlawful activity is immaterial, *see id.* ¶¶ 80-81. These contentions are without merit.

Starting with the issue of the City's statement that it does not intend to rely on the documents in defending the challenged policies, that is of no moment. As is evident from the City's failure to cite a single case in support of its claim, *see* Petition ¶¶ 62, 64,[2] that a party disavows an intent to rely on documents hardly renders the documents irrelevant or undiscoverable. Indeed, the City's position simply buttresses the plaintiffs' belief that those documents will undercut the City's defense and therefore are centrally relevant to this dispute.

Likewise, the City's contention that the documents are not relevant because they "are essentially cumulative of the testimony and documents the City has already produced," Petition ¶ 67, is groundless. A party does not get to withhold otherwise relevant documents simply by declaring that, in that party's view, they duplicate other material the party has produced. And in this instance, there is

---

[2]Paragraph 64 cites two cases but for a different proposition (which is discussed below).

every reason to believe the two sets of documents are not duplicative. As noted

above, the 600 pages of "end user" reports produced by the City represented

information largely drawn from the Internet about protest groups at the outset of

the intelligence operation. By contrast, the documents at issue here report

subsequently gathered information, based upon direct surveillance of the groups,

about their actual protest plans. As evidenced by the fact the department

embarked upon its direct surveillance program, one would reasonably expect this

direct surveillance to yield more accurate information about planned protest

activity than a compilation of Internet postings. The suggestion that the two sets

of documents are merely duplicative, beside beyond legally irrelevant, defies

commonsense.[3]

As for the City's claim that the documents are irrelevant because "those

reports were not reviewed by Commissioner Cohen prior to this dispute, were not

---

[3]The City's suggestion that Judge Sullivan and Magistrate Francis must
have agreed that the two sets of documents were duplicative because they had
access to the documents and did not hold otherwise, *see* Petition ¶¶ 65, 70, has it
backwards. If anything, that both judges ordered production of the documents in
the face of the City's repeated assertions that they were duplicative strongly
indicates that they concluded that the two sets of documents are not duplicative.

As for the City's claim that it is undisputed that the two sets of documents
are merely corroborative, *see, e.g.,* Petition ¶ 109, this is simply false, as the
plaintiffs of course dispute that point. To the extent the City purports to rely on
the absence of evidence from the plaintiffs establishing that the two sets of
documents are not corroborative, that is of no consequence, as the plaintiffs of
course have never seen the documents.

provided to the RNC Executive Committee and therefore had no role in the formation of the policy decisions for the 2004 RNC," Petition ¶ 64, the assertion about the role of the documents is simply contradicted by Deputy Commissioner Cohen's own declaration. As Judge Sullivan noted, that declaration explains that Deputy Commissioner Cohen was briefed on the contents of the documents and used that information in the formulation of the challenged policies:

> The Intelligence Documents formed part of the overall threat assessment that Cohen delivered to members of the RNC Executive Committee, the body that ultimately generated the challenged arrest policies. Cohen stated that "[m]y staff discussed the information contained in the [documents] with me as it was being developed, and I considered it as part of the body of information I analyzed on a continuing basis." Defendants cannot now deny that Cohen based his threat assessment at least in part on such information, even if the documents were at best merely corroborative of data obtained from other sources.

*MacNamara*, Slip Op. at 4 (A389) (quoting Cohen Declaration ¶ 13 (May 2, 2007) (A69)).[4]

As for the City's invocation of the plaintiffs' statement that they do not intend to factually challenge "the NYPD's assessment of the terrorist threat to

---

[4] The City's suggestion that Judge Sullivan agreed that the disputed documents were "merely corroborative" of the City's earlier production, *see* Petition at ¶ 72, is based on a partial quotation of Judge Sullivan and mischaracterizes what he said. As is apparent from the full sentence, Judge Sullivan used "merely corroborative" not in the sense of a factual finding, but in the sense of "even if, *arguendo*."

21

New York City," *see* Petition ¶ 67, that is unavailing. Setting aside the City's

insistence on conflating "the terrorist threat to New York City" with alleged plans

of protest groups,[5] all that was meant by that statement is that the plaintiffs do not

intend to go behind the contents of the intelligence documents (by, as the City

erroneously suggests, seeking to depose undercovers or informants, *see id.* ¶ 106,

or conducting "mini-trials on every individual and group mentioned in the

intelligence documents," *id.* ¶ 83). Rather, they intend to challenge the sufficiency

of the intelligence information on its face to justify, as a matter of law, the

challenged Convention policies, as Judge Sullivan recognized. *See MacNamara*,

Slip Op. at 4 (A389) ("[T]o the extent that the documents reveal a threat that

would have legally justified the City's challenged policies, they will support the

City's defense; to the extent they do not, they will undercut that defense").

Finally, the City assails Judge Sullivan for suggesting the plaintiffs had a

substantial need for the information in the documents, including the names of

groups, because that would inform an assessment of the breadth of any threat and

therefore the legal sufficiency of the justifications for the challenged policies. *See*

---

[5]While the City has and continues to conflate the two -- *see, e.g.*, Petition ¶¶
21, 29 -- the constitutionality of the challenged Convention policies (which
applied only to protestors, not to suspected or potential terrorists) will turn on
what the intelligence documents show with respect to the plans of Convention
protestors and whether the policies were narrowly tailored to address those plans.

Petition ¶¶ 80-81. Specifically, the City charges that Judge Sullivan "does not state what number of groups planning civil disorder would be legally sufficient" and does not "cite any legal authority in support of his assessment of the number's significance." *Id.* ¶ 81. However, the City itself is the one that has taken the position that the number of groups allegedly planning unlawful activity factors into the legal justification for the challenged policies:

> The defenses against [the plaintiffs'] claims will naturally involve explanations for the reasons why the policies in question were adopted. With regard to those explanations, the record in these matters reflects the fact that decisions to adopt those policies were based in large part upon intelligence information that had been gathered <u>regarding the number of individuals planning to attend the RNC in some capacity and the number of groups and individuals intending to, or at least professing to intend to, engage in unlawful activity during the RNC.</u>

Letter to Honorable James C. Francis IV from Assistant Corporation Counsel Gerald S. Smith at 5 (Feb. 21, 2007) (emphasis added) (attached as Exhibit A).

The City's arguments about the relevance of the documents are entirely without merit.

23

## II. THE CITY'S PETITION DOES NOT QUALIFY FOR EXTRAORDINARY MANDAMUS REVIEW BECAUSE IT PRESENTS NO IMPORTANT ISSUE OF FIRST IMPRESSION.

As a threshold matter, mandamus is available only if, as this Court recently explained, three conjunctive conditions are met: "(A) the petition raises an important issue of first impression; (B) the privilege will be lost if review must await final judgment; and (C) immediate resolution will avoid the development of discovery practices or doctrine undermining the privilege." *In re Erie County*, 473 F.3d 413, 416-17 (2d Cir. 2007) (citing cases). The City's petition founders on the initial requirement of an important issue of first impression, as is apparent from its failure to cite a single similar case that qualified for mandamus review.

A. <u>The City's Petition Fails to Present Any Important Issue of First Impression.</u>

In its submissions to this Court, the City has offered varying formulations of what it claims to be the important issue of first impression it seeks to have adjudicated. In its motion requesting a stay pending disposition of the mandamus petition, the City said only that "the facts presented herein are a case of first impression." Declaration in Support of Motion for Emergency Stay ¶ 45 (Jan. 22,

24

2010).  After the plaintiffs challenged the sufficiency of this issue, the City in its

reply framed the asserted issue as

> whether and to what extent highly sensitive, privileged materials are
> discoverable to challenge policy decisions based on substantial and
> real threats to public safety, where the reasons that motivated those
> decisions, which are entitled to considerable deference, are readily
> discernible from publicly-available materials and not contradicted by
> the sensitive materials.

Reply in Further Support of City's Motion for Emergency Stay Pending

Mandamus Review of the District Court's Order at 2 (Feb. 11, 2010).  And in the

petition itself the City identifies the claimed issue of first impression as follows:

> Where a police department adopts a policy in response to real and
> substantial threats to public safety that are supported by both
> privileged and non-privileged intelligence information, which do not
> contradict each other, and the police department will substantiate the
> threat by using only non-privileged materials, must the police
> department also disclose the privileged information in its possession,
> jeopardizing the lives of undercover officers and undermining the
> effective operation of the police department's intelligence division.

Petition ¶ 59.[6]

---

[6]The City subsequently restates this question as follows: "Thus the question
presented here is whether the City is required to disclose each precursor step in the
Intelligence Division's information gathering process, or, stated differently, are
plaintiffs entitled to discover the results of the Intelligence Division's
investigation of each particular group or individual in order to explore the City's
assessment of threats to the public safety that are fully supported by non-
privileged materials already disclosed." Petition ¶ 84.

Though expressed in more words, the latter two formulations simply elaborate on the City's original claim that "the facts presented herein are a case of first impression." Under either formulation, the City is saying nothing more than, given what it deems to be the facts of this case -- a set of facts not found by Judge Sullivan -- that Judge Sullivan misapplied controlling law in ordering production of the redacted documents. *See* Petition ¶¶ 59-85 (section addressing purported issue of first impression). The City fails to identify a single case from this or any other court that supports its suggestion that this discovery dispute presents an important issue of first impression; indeed, other than citing cases that establish the general standards for mandamus review, *see* Petition ¶ 57, the City's petition simply ignores this critical first step.

The City's silence is not surprising, as this Court has made clear that a challenge to a district court's application of established privilege law in a particular case does not qualify for mandamus review. *See In re W.R. Grace & Co.-Conn.*, 984 F.2d 587, 589 (2d Cir. 1993) (dismissing petition claiming erroneous application of "common interest" doctrine to override privileges asserted in specific documents and stating, "Though the contours of the 'common interest' doctrine are significant and deserve careful consideration in the varied circumstances that may arise in relationships between insured and insurer, we do

26

not believe that determination of the doctrine's applicability in each case presents such a novel and important issue as to warrant mandamus review . . . ."); *In re Weisman,* 835 F.2d 23, 27 (2d Cir. 1987) (dismissing petition challenging district court's application of waiver law to privileged documents and stating, "[The District Court judge] applied well-settled principles of law, and whether or not we would agree with his ruling were we reviewing a final judgment on appeal, mandamus is not warranted."); *American Express Warehousing, Ltd. v. Transamerica Insurance Co.,* 380 F.2d 277, 283 (2d Cir. 1967) (rejecting mandamus review and stating, "Finally, both holdings involve application of well-known law to commonplace fact, and rested on the district judge's appraisal of facts and exercise of discretion. Whether the order was correct or not, these bases for it involved no question of first impression.").

By contrast, in those instances in which this Court has found mandamus review of privilege rulings in discovery disputes to be appropriate, it has identified a clear, important, and unresolved legal issue. *See, e.g., In re Sims*, 534 F.3d 117, 129 (2d Cir. 2008) (holding that whether plaintiff who alleged garden-variety emotional distress damage claims waived his psychotherapist-patient privilege was an important issue of first impression in Second Circuit); *In re County of Erie*, 473 F.3d at 417 (holding that whether attorney-client privilege protects

27

communications that pass between a government lawyer having no policymaking authority and a public official where those communications assess the legality of a policy and propose policies in that light was an important issue of first impression in Second Circuit); *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 233 (2d Cir. 1993) (citing to series of conflicting lower court decisions in holding that whether disclosure of attorney work product in connection with a government investigation waives the privilege in subsequent civil discovery was an important issue of first impression in Second Circuit).

Even a cursory examination of Judge Sullivan's ruling reveals he was doing nothing more than applying well-established law governing the law-enforcement privilege to the particular facts of this case. *See MacNamara*, Slip Op. at 3-6 (A388-91). Much as the City may protest the correctness of Judge Sullivan's application of the law in this case, that does not present an important issue of first impression to permit mandamus review. And the City certainly has failed to identify any legal issue presented by Judge Sullivan's ruling that brings it within the ambit of those cases where this Court has found an important issue of first impression.[7]

---

[7]Though unnecessary to reach, the petition also fails to meet the other requirements that the privilege will be lost if review must await final judgment and that immediate resolution will avoid the development of discovery practices or

(continued...)

B. <u>The City's Claim that the Redactions and Protective Order Are Insufficient</u>
<u>Presents No Issue for Mandamus Review and Is Without Merit.</u>

In truth, what seems to be at the heart of the City's petition is its repeated

claim that, notwithstanding the substantial redactions and protective order ordered

by Judge Sullivan and Magistrate Francis, the production of the documents to the

plaintiffs' counsel will lead to the disclosure of confidential sources and

techniques. More specifically, the City posits that the plaintiffs' counsel will

violate the protective order, the documents will be provided to the groups who

---

[7](...continued)
doctrine undermining the privilege. *In re Erie County*, 473 F.3d at 416-17.

With respect to loss of the privilege, Judge Sullivan's order requires the
City to do nothing more than produce one set of the redacted documents to
plaintiffs' counsel subject to a strict attorneys-eyes-only confidentiality order.
Setting aside the dispute over the sufficiency of the redactions, even under the
City's scenario, the threatened disclosure of confidential sources and techniques
arises only if groups who were subject to surveillance obtain the documents, learn
of the surveillance, and then are able to identify a confidential source. But
because of the protective order, that will not happen under Judge Sullivan's order.
In other words, the City's claim to the law-enforcement privilege remains fully
intact under that order unless and until Judge Sullivan authorizes public disclosure
of the documents -- for instance, through an unsealed court submission. Only then
would the second requirement for mandamus review be met.

As for the final requirement for mandamus review, the City only asserts,
without any explanation, that "the District Court's order undermines the law
enforcement privilege" and "threatens the future viability of the law enforcement
privilege." Petition ¶ 98. In truth, immediate resolution of this matter will have
no bearing on general discovery practices or doctrine because the only thing at
issue here is the correctness of Judge Sullivan's application of established
privilege law to the facts of this case.

29

were the subject of surveillance, and those groups will then be able to identify the confidential source by virtue of learning they had been spied upon and by virtue of other information in the reports. *See* Petition ¶¶ 110, 114-15 (discussing protective order), ¶¶ 40-41, 103 (discussing Cohen declaration).

The proffer of this argument as a basis for mandamus review encounters numerous problems. First and foremost, whether the redactions and protective order are sufficient to protect confidential sources and techniques is a purely factual matter particular to these 2,000 pages of documents and the numerous redactions. For this Court even to contemplate the merits of the City's claim, it would have to review the documents and redactions, which is not appropriate for mandamus review.

Moreover, there is no reason to doubt the work of the lower court. Even a cursory review of the lower court opinions -- and in particular Magistrate Francis's rulings, which are reproduced in the appendix at pages 154-74 and 224-47 -- reveals tremendous sensitivity to the City's concerns and exacting, page-by-page attention to redactions. This is not a case where a district court cavalierly brushed aside weighty law-enforcement concerns.

30

Finally, the City's claims seem patently overblown. Even if one ignored the protective order -- and there is no reason to do so[8] -- it is extremely difficult to see how disclosure of the limited information at issue here -- the plans of protest groups and their names -- would lead to the disclosure of confidential sources and techniques so as to imperil them. First, with the most recent surveillance having taken place in 2004, nothing in the record establishes how many, if any, of the groups even still exist now six years later. Second, nothing in the record explains how protest groups that may have had many meetings with scores if not hundreds of people over many months six years ago would be able to identify the source of a

---

[8]The City asserts "there has already been a serious breach of the attorneys' eyes only protective order," pointing to *New York Times* story about the NYPD's political surveillance operation published one week after the City provided the 600 pages of documents to plaintiffs counsel in all the Convention cases. *See* Petition ¶ 114 (referring to J. Dwyer, "City Police Spied Broadly Before G.O.P. Convention," *New York Times*, Mar. 25, 2007, at A1). There is no basis for this accusation, and in an earlier ruling -- which the City did not appeal -- Magistrate Judge Francis rejected the City's contention the *Times* had obtained documents subject to the protective order from plaintiffs' counsel. *See Schiller v. City of New York*, 2007 WL 1623108 (S.D.N.Y., June 5, 2007). Moreover, even a cursory review of the lengthy *Times* story reveals that it relies on many sources and would have been developed long before the City produced the 600 pages.

Indeed, the only evidence of a party to this litigation publicly disclosing the intelligence documents while the protective order was in effect comes in the form of a *Wall Street Journal* story in which Deputy Commissioner Cohen, NYPD Commissioner Raymond Kelly, and NYPD Deputy Commissioner for Public Information Paul Browne all met with the reporter and reviewed the 600 pages and, seemingly, the undercover reports at issue here. *See* J. Miller, "When Activists Are Terrorists," *Wall Street Journal*, May 3, 2007 (courtesy copy attached Exhibit C), *discussed in Schiller*, 2007 WL 1623108, at *2, 4.

31

report about the group's protest plans. (In one instance, the City did identify a small group that might be able to identify a source, and Judge Francis ordered redaction of the group's name and of other information. *See Schiller*, Slip Op. at 21 (A244).) Third, it is worth noting that this surveillance was not of terrorist groups or even conventional criminal enterprises such as drug gangs; it was of protest groups, and nothing in the record suggests that they would be looking to take violent action against confidential sources if they could identify them.

Finally, the particulars of the surveillance operation were widely reported in March 2007. *See* J. Dwyer, "City Police Spied Broadly Before G.O.P. Convention," *New York Times*, Mar. 25, 2007, at A1 (available at http://www.nytimes.com/2007/03/25/nyregion/25infiltrate.html?_r=1). Moreover, the names of groups that may have been directly spied upon have been posted on the *Times* website since May 2007 (available at http://www.nytimes.com/ref/nyregion/RNC_intel_digests.html) after Magistrate Francis ruled that the City could not keep secret the original 600 pages of documents, and the City chose not to appeal. *See Schiller v. City of New York*, 2007 WL 1299260 (S.D.N.Y., May 4, 2007). Any group involved in the Convention protests likely has known for three years that it was spied on or was likely to have been spied on.

32

Notwithstanding this, the City has never even suggested that any harm or detriment has come to either undercover officers or the NYPD's intelligence operations as a result of the public availability of the names of groups and individuals surveilled in the run-up to the Convention. Although the City contends that the disputed documents contain information about additional targets not identified in the original 600 pages, the absence of any incident or evidence of harm during the nearly three years that many (even if not all) of the targets' names have been in the public domain negates the City's alarmist claims as to the harm likely to result if the redacted disputed documents become public.

## III. BY ASSERTING THE INTELLIGENCE OPERATION AS ITS DEFENSE, THE CITY HAS WAIVED ANY CLAIM IT HAD TO A PRIVILEGE.

Beyond the fact that its petition does not qualify for mandamus review, the City, by putting forth the surveillance operation as its defense, cannot at the same time invoke the law-enforcement privilege to block the plaintiffs from discovering information about the operation that bears on the validity of that defense. As this Court noted in a relatively recent mandamus proceeding, *see In re Grand Jury Proceedings John Doe Co.*, 350 F.3d 299, 303 (2d Cir. 2003), both this Court and

the Supreme Court have held that under such circumstances the party waives the privilege.[9]

This Court addressed this issue in *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991). That case arose out of a criminal prosecution alleging fraud by the defendant. At trial, he wanted to present as a defense that he had acted in good faith based upon his understanding of the law and, in conjunction with that, had filed a motion *in limine* "seeking a ruling permitting him to testify regarding his belief in the lawfulness of describing the source of funds as 'personal' without being subjected to cross-examination on communications he had with his attorney on this subject, discussions ordinarily protected by the attorney-client privilege." *Id.* at 1291. The District Court would not grant the motion, and on appeal this Court squarely held that the assertion of the defense waived the privilege claim:

---

[9]Though the plaintiffs did not cite the cases discussed in this section to Judge Sullivan, they made the same point at the outset of their brief. *See* Plaintiffs' Opposition to Defendants' Rule 72 Objections at 8 (A315) ("To the contrary, it is the City that inserted the operation into the cases, and it is the City that has insisted the operation is critical to the case because, according to the City, it generated information about protest groups that justifies the policies the plaintiffs challenge. Having chosen this course, the City does not now get to block access to information generated by the operation, which might well undermine its defense."). Moreover, the Court is free to affirm on alternative grounds. *See, e.g., McNally Wellman Co. v. New York Electric & Gas Corp.*, 63 F.3d 1188, 1194 (2d Cir. 1995) ("We need not affirm for the reasons expressed by the district court, but may affirm on any ground supported by the record.").

However, the attorney-client privilege cannot at once be used as a shield and a sword. A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes. Thus, the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications. This waiver principle is applicable here for [the defendant's] testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue. His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent.

*Id.* at 1293.

Sixteen years earlier, the Supreme Court had adopted this approach to privilege waiver in a case that closely resembles the one before this Court. In *United States v. Nobles*, a defendant charged with bank robbery wished to present testimony from an investigator about statements the investigator had collected from witnesses the prosecution relied upon to identify the defendant as the robber. 422 U.S. 225, 227-29 (1975). The investigator had prepared a written report at the time he collected the statements, which the government then sought in conjunction with its cross-examination of the investigator about the accuracy of his testimony concerning the statements made to him by the witnesses. When the defense refused to produce the report, the District Court ruled that the investigator could not testify about his interviews of the witnesses. *See id.*

35

The Supreme Court affirmed, holding that the defendant had waived his

work-product privilege in the report by seeking to use the investigator's testimony

about the witness statements in his defense:

> The privilege derived from the work-product doctrine is not absolute.
> Like other qualified privileges, it may be waived. Here respondent
> sought to adduce the testimony of the investigator and contrast his
> recollection of the contested statements with that of the prosecution's
> witnesses. Respondent, by electing to present the investigator as a
> witness, waived the privilege with respect to matters covered in his
> testimony. Respondent can no more advance the work-product
> doctrine to sustain a unilateral testimonial use of work-product
> materials than he could elect to testify in his own behalf and
> thereafter assert his Fifth Amendment privilege to resist cross-
> examination on matters reasonably related to those brought out in
> direct examination.

422 U.S. at 239-40.

The case now before this Court falls squarely within *Nobles* and *Bilzerian*.

Here the City intends to assert a defense through the testimony of a witness --

Deputy Commissioner Cohen -- who will claim that the City adopted the

challenged Convention policies because of information it had about the plans of

protest groups. At the same time, the City seeks to invoke a privilege to bar the

plaintiffs from obtaining copies of reports that describe what the NYPD in fact had

learned about the plans of the groups through its surveillance operation, with it

being established through Deputy Commissioner Cohen's own affidavit that he

36

was provided with the information from the reports when he was developing the challenged policies.

This is the same type of position taken by the defendants in *Nobles* and *Bilzerian*. Just as this Court held in *Bilzerian* that the defendant's claim that he believed his actions were lawful "would have put his knowledge of the law <u>and the basis for his understanding of what the law required</u> in issue," 926 F.2d at 1292 (emphasis supplied), the planned testimony from Deputy Commissioner Cohen that the City adopted the challenged policies because of what it learned about the plans of protest groups puts the basis of his understanding of those plans -- including the disputed intelligence documents -- at issue. And the underlying investigator report in *Nobles* is indistinguishable from the reports at issue here, in that both provided direct and contemporaneous factual information on the subject about which the defense witness wished to testify – the statements of eyewitnesses in *Nobles* and the plans of protest groups here.

Under *Bilzerian* and *Nobles*, the City cannot assert the intelligence operation as a defense and also seek to invoke a privilege to withhold documents detailing the information obtained during the operation. If it wishes to assert this

37

defense, it waives the privilege. This provides an independent basis for this Court to dismiss the petition.[10]

## IV. THE CITY'S PETITION FAILS TO DEMONSTRATE THAT JUDGE SULLIVAN ABUSED HIS DISCRETION UNDER RULE 72 OF THE FEDERAL RULES OF CIVIL PROCEDURE.

Finally, even if the City's petition qualified for mandamus review and even if the City had not waived its privilege claim, the City still would need to show that Judge Sullivan abused his discretion on the merits of his privilege ruling. *See, e.g. In re Claus von Bulow,* 828 F.2d 94, 97, 101 (2d Cir. 1987) (after finding that petition qualified for mandamus review, holding that district court had not abused its discretion in concluding that party had waived his privilege).

It is important to note at the outset that the City ignores both the stringent standard governing this Court's review of Judge Sullivan's order and the specific procedural history of this case, which elevates the standard even further. The City argues that Judge Sullivan "erred in several key respects," *see* Petition ¶ 69, but error alone is far from sufficient: "Mere error, even gross error in a particular case,

---

[10]In addition, the City never produced a privilege log. which violates Rule 26.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts. That failure "alone may result in a determination that the noncompliant party has waived any privilege claim that otherwise might have existed." *Five Borough Bicycle Club v. City of New York,* 2008 WL 704209 *3 (S.D.N.Y., Mar. 10, 2008) (collecting cases).

as distinguished from a calculated and repeated disregard of governing rules, does not suffice to support issuance of the writ." *In re "Agent Orange" Product Liability Litigation*, 733 F.2d 10, 13 (2d Cir. 1984) (internal quotations, emendation, and citation omitted).

Moreover, the specific ruling before this Court is one pursuant to Rule 72 of the Federal Rules of Civil Procedure denying an appeal of a magistrate's discovery ruling. *See MacNamara*, Slip Op. at 2, 3 (A387-88) (discussing City's Rule 72 appeal in this matter). As such, the issue before Judge Sullivan was whether Magistrate Judge Francis had abused his discretion in ordering the production of redacted documents subject to the protective order. *See* F.R.C.P. 72 (a); *accord Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007) (noting district court standard of review under Rule 72). Thus, the City bears the extraordinary burden of demonstrating that Judge Sullivan abused his discretion in applying an abuse-of-discretion standard to Magistrate Judge Francis's ruling.

In its petition, the City does not even acknowledge the correct standard of review and does not even purport to satisfy it. For this reason alone, its petition should be dismissed.

Even if this Court were to attempt on its own to discern from the City's petition arguments sufficient to meet the extraordinarily high standard governing

39

review of Judge Sullivan's order, the City's petition still would be without merit, as nothing in it comes close to meeting that standard.

## A. The Merits Section of the City's Petition Fails to Demonstrate that Judge Sullivan Abused His Discretion.

It is not easy to ascertain the City's arguments with respect to the merits of Judge Sullivan's ruling. Given the overall structure of its petition, in which paragraphs 59-98 address the threshold issue of whether this matter qualifies for mandamus review, paragraphs 99-109 -- under the heading "The December 10 Order Impairs the Law Enforcement Privilege" -- appear to present the City's merits argument. Setting aside the failure to acknowledge the relevant standard of review, those paragraphs provide nothing more than a recitation of undisputed law-enforcement privilege standards, *see* Petition ¶¶ 99-100; the observation that open-records laws contain a law-enforcement exception, *see id.* ¶ 101; a discussion of a New York Court of Appeals case applying well-established principles of the law-enforcement privilege to the specific facts of that case, *see id.* ¶ 102; a summary of Deputy Commissioner Cohen's declaration testimony about redactions and of Magistrate Judge Sullivan's response, *see id.* ¶ 103; the observation about the undisputed sensitive nature of the identities of undercover

officers, *see id.* ¶ 104; a summary of Deputy Commissioner Cohen's declaration testimony about violent protests in other cities, *see id.* ¶ 105; a claim – bordering on the hysterical – that, should Judge Sullivan's order stand, "[n]othing appears to prevent plaintiffs from demanding that the sources of the reports in the Intelligence Documents be identified and subject to deposition" and thus 'shred[] the law enforcement privilege," *see id.* ¶ 106; and argument that the City should not have to produce the documents given its claim that the documents merely corroborate the 600 pages already produced, *see id.* ¶ 107-09.[11]

These paragraphs plainly do not establish that Judge Sullivan abused his discretion in concluding that Magistrate Francis had not abused his discretion. At most, they discuss undisputed law and some of Deputy Commissioner Cohen's

---

[11]As part of this argument the City, citing this Court's ruling in *Tabbaa v. Chertoff,* contends the District Court "should have . . . reviewed the documents *in camera*" to determine the extent to which they merely corroborated the 600 pages. Petition ¶¶ 107-09. This is an odd contention, given that the City then acknowledges that Magistrate Francis in fact did review the documents *in camera, see id.* ¶ 109; indeed, he did so in exacting detail, *see Schiller v. City of New York,* 244 F.R.D. 273 (S.D.N.Y. 2007) (A154-75); *Schiller v. City of York,* 252 F.R.D. 204 (S.D.N.Y. 2008) (A224-49). Moreover, as discussed above, *see infra* I.B., the City's repeated factual assertion that the disputed documents are duplicative of the 600 pages provides no basis for shielding them from discovery.

As for *Tabbaa,* there this Court did nothing more than, in resolving ambiguities in the factual record underlying summary judgment, review on its own initiative classified information bearing on that ambiguity. *See* 509 F.3d 89, 93 n.1 (2d Cir. 2007). That case did not present any dispute about discovery or the law-enforcement privilege, and nothing in it bears on the City's claim that the intelligence documents at issue here are immune to discovery.

41

testimony and then argue it was wrong to order production of the documents in light of the City's assertion -- rejected by Judge Sullivan -- that the plaintiffs had no substantial need for the documents. This type of argument, beyond being unpersuasive, falls far short of the showing required for mandamus.

The final section of the City's petition purports to challenge the sufficiency of the protective order entered by Magistrate Judge Francis and approved by Judge Sullivan. *See* Petition at 52 (heading), ¶¶ 110-25. Only the first portion of the section, however, addresses the protective order, *see id.* ¶¶ 110-15, and in doing so does nothing more than argue it is insufficient, which again falls far short of any showing that Judge Sullivan abused his discretion in relying on it. The balance of the section is devoted to rearguing the factual proposition -- rejected by Judge Sullivan -- that disclosure of the disputed documents, notwithstanding the substantial redactions and protective order, will reveal confidential sources and techniques and claiming that this court's recent ruling in *Wilner v. National Security Agency*, 592 F.3d 60 (2d Cir. 2009), required Judge Sullivan to accept Deputy Commissioner Cohen's position that the documents were protected by the law-enforcement privilege. *See* Petition ¶¶ 116-24.

The lack of any merit to the City's challenge to the sufficiency of the redactions and protective order are addressed above in section II.B. As for *Wilner,*

42

it does not support the City's position. That case involved the National Security Agency and Department of Defense asserting the so-called "Glomar doctrine," which allows the government, when faced with a Freedom of Information Act request, to refuse to confirm or to deny the existence of classified documents responsive to the FOIA request. And in that extraordinary context, this Court stated the courts are required to "accord substantial weight to the agency's affidavits." *See* 529 F.3d at 73 (internal quotations and citations omitted).

Nothing about *Wilner* establishes that Judge Sullivan abused his discretion. This case does not involve classified documents or FOIA, the disputed NYPD documents are at issue only because the City itself came forward with the intelligence operation (and thus waived its privilege claim entirely), and there has been no showing or suggestion that Judge Sullivan and Magistrate Francis did not accord "substantial weight" to Deputy Commissioner Cohen's declaration. (To the contrary, both of their decisions reflect considerable deference to Mr. Cohen.) What the City really seems to suggest is that Judge Sullivan was required to abdicate to that declaration, but that goes much further than this Court required even in the Glomar context. Needless to say, it is the courts, not law-enforcement officials, who are responsible for making the final decision about application of the law-enforcement privilege in discovery disputes.

43

B. The City's Remaining Arguments Are Without Merit.

In paragraph 69 of its petition, the City claims Judge Sullivan "erred in several key respects," and then follows with a list of what it claims to be errors on his part. This discussion, however, is contained in the section that purports to address whether the petition presents an important issue of first impression, *see* Petition at 26 (section heading). Assuming, however, the City intends these claims of error to go to the merits of Judge Sullivan's privilege ruling, the plaintiffs address them.

The City first criticizes Judge Sullivan and Magistrate Francis for not making a finding, based on an *in camera* review of the disputed documents, about whether Deputy Commissioner Cohen "intentionally misled the RNC Executive Committee about threats to public safety." Petition ¶ 70. However, whether Deputy Commissioner Cohen did so or not is irrelevant because the issue to be decided by the District Court is whether, in light of the information Cohen and the Executive Committee had from the reports and other sources, the challenged policies were legally justified. That Judge Sullivan made no finding about whether Deputy Commissioner Cohen intentionally misrepresented the intelligence information is immaterial.

The City then argues that Judge Sullivan Court "erred" by "conflat[ing] potential relevance [of the disputed documents] with the showing of need that is required to overcome the assertion of the law enforcement privilege." Petition ¶ 71. This contention is squarely contradicted by Judge Sullivan's finding that "Magistrate Judge Francis effectively determined the relevance of the Intelligence Documents, and balanced the harm of disclosure against the parties' showing of substantial need for the information sought." *MacNamara*, Slip Op. at 6 (A391). Judge Sullivan did not conflate "relevance" with "substantial need" but recognized them as distinct factors.[12]

The City next argues that Judge Sullivan erred by ordering production of documents that are "merely corroborative" of information already disclosed. *See* Petition at ¶ 72. For the reasons discussed in section I.B, this is without merit.

Finally, the City contends that, in light of two Fourth Amendment special-needs cases, Judge Sullivan erred in failing to accord sufficient deference to "law

---

[12]Moreover, Judge Sullivan found that, in light of the redactions, substitute codes and protective order authorized by Judge Francis, as well as the fact that the plaintiffs were only seeking information gathered about Convention protest-related activity and not about confidential sources or techniques, the City had "not made a substantial threshold showing that there are specific harms likely to accrue from disclosure of the now-redacted Intelligence Documents." Slip Op. at 6 (A391) (internal quotations and citation omitted). Absent such a showing of harm, Judge Sullivan was not required to weigh the government's purported interest in non-disclosure against the plaintiffs' need for the information, yet he nonetheless did so.

enforcement officers who adopt policies in response to threats to public safety."
*See* Petition ¶¶ 74-78, 81 (citing *MacWade v. Kelly*, 460 F.3d 260 (2d Cir. 2006),
and *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444 (1990)). However,
neither case presented any discovery issue, nothing in either case purported to
address such an issue, and the City does not suggest otherwise. What those cases
did hold is that, in the context of special-needs controversies in which the
effectiveness of a suspicionless search program is in dispute, the courts are to give
substantial weight to law-enforcement officials' assessment of the program's
effectiveness (which is a prong of the special-needs doctrine). Nothing about that
proposition remotely supports the City's suggestion that the cases immunize it
from the discovery at issue here, and the City tellingly fails to cite a single case
interpreting *MacWade* and *Sitz* to bar any kind of discovery, much less discovery
into a central defense asserted by a party.

   None of the City's arguments demonstrate that Judge Sullivan abused his
discretion in finding, pursuant to Rule 72, that Magistrate Francis had not abused
his discretion in ordering the disputed documents produced as redacted and
subject to the protective order. The extraordinary remedy of a writ of mandamus
is therefore not available.

46

CONCLUSION

For all the foregoing reasons, the plaintiffs-respondents ask that the Court

dismiss the City's mandamus petition.

Respectfully submitted,

CHRISTOPHER DUNN
ARTHUR EISENBERG
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, N.Y. 10004
(212) 607-3300

Counsel for *Dinler* and *Schiller* Plaintiffs-
    Respondents


Jonathan C. Moore
Clare Norins
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue – 16th Floor
New York, New York 10016
(212) 490-0400

Attorneys for *MacNamara* Plaintiffs-
    Respondents and Putative Class Members

Dated: April 8, 2010
        New York, N.Y.

Mohammed Gangat on the brief for
    *Dinler* and *Schiller* Plaintiffs-Respondents

mandopp.rnc2

# EXHIBIT A



MICHAEL A. CARDOZO
*Corporation Counsel*

THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

Gerald S. Smith
*Assistant Corporation Counsel*
Tel: (212) 513-7927
Fax: (212) 788-9776

February 21, 2007

**VIA HAND DELIVERY**
Honorable James C. Francis, IV
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:  *Schiller v City of New York*, 04 CV 7922 (KMK) (JCF)
*Dinler v. City of New York* 05 Civ. 8453 (KMK) (JCF)

Dear Judge Francis:

Defendants write in response to Plaintiffs' letter dated February 2, 2007 asking this Court to preclude NYPD Deputy Commissioner of Intelligence David Cohen from testifying at trial and to preclude Defendants from introducing at trial any of the documents produced during discovery at Bates Numbers 102515 to 103717 ("Intelligence Documents"). Plaintiffs' request should be denied. Plaintiffs were on notice of Commissioner Cohen's identity at least as early as December of 2005 and Commissioner Cohen's role was further fully established through other deposition testimony. Plaintiffs' assertion that they were not on notice flies in the face of the record of this case, and their motion is completely baseless.

For the reasons explained more fully below, preclusion of Commissioner Cohen and the Intelligence Documents is not appropriate in the above-captioned matters. First, Defendants complied with their discovery obligations including their obligations under Federal Rule of Civil Procedure 26. Second, preclusion of either Commissioner Cohen or the Intelligence Documents is not appropriate as both are central to Defendants' defense at trial in these matters. Third, Plaintiffs cannot demonstrate any prejudice. The parties are not on the eve of trial and plaintiffs may depose Commissioner Cohen, whose deposition is scheduled for March 28, 2007. Defendants now address the issues of Commissioner Cohen and the Intelligence Documents separately below.

**I.    Commissioner Cohen Should Not Be Precluded From Testifying At Trial**

      In Softel, Inc. v. Dragon Med. & Sci. Communs., 118 F.3d 955 (2d Cir 1997), the Court outlined the four factors that a Court should consider before precluding evidence under Federal Rule of Civil Procedure 37. Those factors are: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to meet the new testimony; and (4) the possibility of a continuance." Softel, Inc.,118 F.3d at 961 (citing with approval Outley v. City of New York, 837 F.2d 587, 590-91 (2d Cir. 1988)). This balancing of factors is meant to take into account the relative import of the disputed documents or testimony to the litigation and the impact on *both* parties should evidence be precluded. See Design Strategy, Inc. v. Davis, 469 F.3d 284, 297 (2d Cir. 2006). Contrary to Plaintiffs' characterization, preclusion is not an automatic remedy under Rule 37 but rather "is a drastic remedy and [a court should] exercise discretion and caution" before imposing it as a sanction. Ventra v. United States, 121 F.Supp.2d 326, 332 (S.D.N.Y. 2000), See *also* Design Strategy, Inc. v. Davis, 469 F.3d 284, 298 (2d Cir. June 19, 2006) ("[T]he plain text of the rule provides that...the court does have discretion to impose other, less drastic, sanctions"). In the instant case, Commissioner Cohen should not be precluded from testifying at trial because he was properly identified as a potential witness, his testimony is central to the Defendants' case, and Plaintiffs cannot demonstrate any prejudice that would result from his admission as a witness at trial.

**A.    Defendants Complied With The Federal Rules Of Civil Procedure**

      Contrary to Plaintiffs' assertion, Defendants have not failed to fulfill any of their discovery obligations. Plaintiffs contend that Defendants did not fulfill their obligations under the Federal Rules of Civil Procedure, and specifically their obligations under FRCP 26, because they did not supplement their initial Rule 26 Disclosures to formally identify Commissioner Cohen as a potential witness. This, however, is an inaccurate interpretation of a party's obligation under Rule 26. Specifically, FRCP 26(a)(1)(a) requires parties to supplement its initial disclosures "to include information thereafter acquired if...the party learns that in some material respect the information disclosed is incomplete or incorrect *and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process*". Fed. R. Civ. P. 26(e)(1) (emphasis added). See *also* Hiep v. Clark, 1995 U.S. Dist. LEXIS 21206, *5-6 (S.D.N.Y. Sept. 9, 1996); Boynton v. Monarch, 1994 U.S. Dist. LEXIS 11967, *2-4 (N.D. Ill. Aug. 25, 1994). It is clear from the record in these matters that Commissioner Cohen was identified through the testimony of multiple fact witnesses as communicating intelligence information to the decision makers as well as other police officers involved in policing the Republican National Convention ("RNC"). Plaintiffs' claim that Commissioner Cohen's identity and involvement had not been made known to them during the discovery process is belied by the record.

      i.    Commissioner Cohen Was Identified As A Potential Witness In Deposition Testimony

      Commissioner Cohen was identified at least as early as December 2005, in the deposition of Chief Terence Monahan. Chief Monahan testified that Commissioner Cohen played an important role in the collection and distribution of the intelligence information which informed the members of the NYPD who planned and implemented all RNC policies. See Deposition of Terence Monahan at pp. 73-81 (identifying Commissioner Cohen as having given a training lesson, including a power point presentation,

2

prior to the RNC concerning intelligence information the NYPD had gathered to that point regarding potential disruptive behavior at the RNC). (Relevant excerpts from the Deposition of Terence Monahan are attached at Exhibit 1.)

Commissioner Cohen was again identified during the Chief of Department Joseph Esposito's deposition in July of 2006. Chief Esposito repeatedly testified regarding the important role Commissioner Cohen played in preparing for the RNC. See Deposition of Joseph Esposito at pp. 358-359 (stating that Commissioner Cohen was in charge of gathering intelligence information in connection with the RNC and briefing Chief Esposito on that information); 361-362 (identifying Commissioner Cohen as the individual who briefed the NYPD Executive Committee on at least 5 separate occasions regarding intelligence information gathered prior to the RNC); 467-468 (testifying that Commissioner Cohen delivered daily briefings during the RNC regarding current intelligence information); 777-778 (describing weekly meetings prior to the RNC at which Chief Esposito, Commissioner Cohen, and Commissioner Ray Kelly discussed intelligence information regarding potential behavior at the RNC). [1] (Relevant excerpts from the Deposition of Joseph Esposito are attached at Exhibit 2.)

     ii.    Plaintiffs Cannot Claim That The Deposition Testimony Did Not Put Them On Notice
           Of Commissioner Cohen As A Potential Witness

Based on the foregoing testimony, it was patently clear to plaintiffs that Commissioner Cohen played an important role in preparing for the RNC; indeed, they were on notice. Plaintiffs, unable to dispute that notice, instead craft the argument that Commissioner Cohen was never identified in deposition testimony as an individual involved in the *decision making* processes prior to the RNC. First, assuming, *arguendo*, that Commissioner Cohen was not involved in the decision making process for the RNC, that does not diminish the important role Commissioner Cohen played in preparing for the RNC, as testified to by Chief of Department Esposito and Chief Monahan. Plaintiffs' complaint that they "discount[ed]" Commissioner Cohen's importance despite being on notice of the role Commissioner Cohen played was a strategic decision by plaintiffs and they should not now be allowed to complain about it.

Second, Plaintiffs' reliance on the depositions of Chief Colgan as support for their claim that Commissioner Cohen had been properly discounted by them as a potential witness is misplaced. For example, Plaintiffs claim that Chief Colgan testified that Commissioner Cohen was not present at a

---

[1] Commissioner Cohen was listed as a potential trial witness on a witness list produced to Plaintiffs on December 12, 2006, which was later revised on January 31, 2007. In that list, Defendants identified multiple individuals who have knowledge of, and therefore may testify about the specific facts of a given arrest location or "the Planning, Preparation, Policing, and Arrest Processing for the RNC". See Defendants' 26(a)(1)(a) Supplementation of Jan. 31, 2007, annexed as Exhibit 8 to Dunn Declaration. Commissioner Cohen was described on that list as follows: "Commissioner Cohen was the Deputy Commissioner of Intelligence during the RNC and may testify about the need for and development of intelligence information in connection with security issues during the RNC". This statement is fully consistent with the deposition testimony of Chiefs Esposito and Monahan regarding Commissioner Cohen's role in the planning of the RNC.

meeting in which Chief Colgan presented his mass arrest processing plan to Commissioner Kelly. This is not an accurate reflection of Chief Colgan's testimony. When asked whether Commissioner Cohen had been present at that particular meeting, Chief Colgan did not say that he was not present but rather replied that *he could not recall* whether Commissioner Cohen had been at the meeting. See Deposition of John Colgan, p. 49, lines 18-19. (Relevant excerpts from the Deposition of John Colgan are attached at Exhibit 3.) Plaintiffs also cite to the fact that Chief Colgan testified that he did not have any specific conversations with Commissioner Cohen regarding the fingerprinting policy. See Deposition of John Colgan, p. 101, lines 13-15. However, Chief Colgan also testified that the fingerprint policy had already been adopted by the time he assumed his role as Commanding Officer of the Criminal Justice Bureau. See Deposition of John Colgan, pp. 127 - 130. Therefore, the fact that Chief Colgan did not have any conversations with Commissioner Cohen about the fingerprinting policy hardly forecloses the possibility that Commissioner Cohen may have had conversations with other NYPD personnel, or may have been involved in that decision in some capacity of which Chief Colgan was not aware.

Plaintiffs also disingenuously argue that they were led to believe that Commissioner Cohen was not involved in RNC planning. Specifically, plaintiffs state that Chief Esposito "never identified Mr. Cohen as having played a role" in RNC-related decisions. (Dunn Declaration at 20). This assertion is belied by the record set forth above where Chief Esposito testified in detail about Commissioner Cohen's role. It appears that plaintiffs are simply ignoring the full record developed over the entire course of the depositions. As the Court is aware, the depositions of the witnesses discussed above were conducted over several days, and each witness was questioned by multiple counsel. The fact that *this* Plaintiffs' counsel did not elicit the information about Commissioner Cohen's import during his questioning does not diminish the fact that Plaintiffs were on notice of Commissioner Cohen's role based on the *entirety* of the deposition testimony. See, *e.g.*, Deposition of Joseph Esposito, July 11, 2006, at pp. 357-363 (questioning conducted by Jeffrey Rothman,), 468-469 (questioning conducted by Mr. Rothman); Deposition of Joseph Esposito, July 21, 2006, at pp. 712-713 (questioning conducted by Jonathan Moore), 777-780 (questioning conducted by Karen Wohlforth), 794-799 (questioning conducted by Ms. Wohlforth). Moreover, at least one of Plaintiffs' counsel (Mr. Dunn and Ms. Hung) routinely attended all days of the relevant deposition testimony. In addition, even during these Plaintiffs' counsels' examinations the identity and role of Commissioner Cohen was revealed when Chief Monahan specified to Mr. Dunn about Commissioner Cohen's role, as noted above. Finally, the relation of intelligence information to decisions made concerning RNC policies as well as the prevalence of intelligence information prior to the RNC was articulated to Mr. Dunn during his own examination of Chief Esposito. See Deposition of Joseph Esposito, July 7, 2006, at pp. 184-194.

Based upon these numerous references to Commissioner Cohen in the testimony of multiple witnesses, including the specific identification of Commissioner Cohen during Plaintiffs' counsel's questioning in which counsel describes Commissioner Cohen as having discussed the policing of demonstrations[2], Plaintiffs' claim that they were not on notice of who Commissioner Cohen was, and what his role was with regard to the RNC should be rejected.[3] Therefore, under the plain language of

---

[2] See, *e.g.* Deposition of Terence Monahan at pp. 74-75.

[3] In addition to these numerous references to Commissioner Cohen by other witnesses, it should be noted that Christopher Dunn, the lead counsel for the Plaintiffs in these matters, is an experienced attorney who Continued...

Rule 26(a)(1)(a) as well as relevant case law, Defendants have complied with the requirements of Rule 26 and Commissioner Cohen should not be precluded from testifying at trial. See, e.g., Hiep v. Clark, 1995 U.S. Dist. LEXIS 21206, *5-6 (S.D.N.Y. Sept. 9, 1996)

**B.    Commissioner Cohen's Testimony Is Central To Defendants' Case**

The second factor to be considered under Softel when weighing the preclusion of a witness is the importance of the testimony of the precluded witness. Softel, 118 F.3d at 961. This factor also weighs in favor of admitting the testimony of Commissioner Cohen at trial.

Plaintiffs have made clear on numerous occasions that two of their claims in these litigations revolve around the NYPD's decision to fingerprint all RNC-related arrestees and not to issue summonses to those arrestees. In addition, Plaintiffs allege that these policies were adopted to retaliate against and punish individuals for demonstrating during the RNC. The defenses against these claims will naturally involve explanations for the reasons why the policies in question were adopted. With regard to those explanations, the record in these matters reflects the fact that the decisions to adopt those policies were based in large part upon intelligence information that had been gathered regarding the number of individuals planning to attend the RNC in some capacity and the number of groups and individuals intending to, or at least professing to intend to, engage in unlawful behavior during the RNC. See Deposition of Joseph Esposito, July 7, 2006, at pp. 184-194.[4]  Moreover, as set forth *supra*, Commissioner Cohen has been identified as being personally involved in the collection and presentation of that intelligence information to other NYPD officials. See, e.g., Deposition of Terence Monahan, Dec. 1, 2005, at p. 73, line 24 to p. 82; Deposition of Joseph Esposito, July 11, 2006, at pp.357-360. In fact, in some instances it may be that Commissioner Cohen was *the only individual* who delivered such briefings. See Deposition of Joseph Esposito at pp.361-362; 467-468; 777-778. Given the import of Commissioner Cohen's testimony, and the effect its preclusion would have upon the chances of Defendants mounting a successful defense against Plaintiffs' claims, this second prong under Softel should weigh against preclusion and Commissioner Cohen should be allowed to testify. See Outley, 837 F.2d at 591 (holding that where evidence is central to a party's chances of success in litigation "only extreme misconduct on the part of the [party] or extreme prejudice suffered by the [opposing party] would justify the extraordinary sanction of preclusion").

---

has brought numerous lawsuits against the NYPD, and openly admits that he is intimately familiar with the identities of virtually every high ranking member of the NYPD, including Commissioner Cohen. The record is clear on the role intelligence played in preparing for the RNC, and a claim otherwise, by this sophisticated litigant is preposterous.

[4] The role intelligence information played in RNC planning has been clear throughout discovery and does not constitute a "shift in theories being offered against [them]" as Plaintiffs claim in their February 2nd letter.

**C.**    **Plaintiffs Cannot Demonstrate They Would Suffer Any Prejudice**

The final two factors the Court should consider under Softel when weighing a decision to preclude evidence is "the (3) prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Softel, 118 F.3d at 961. Both of these factors weigh against the preclusion of Commission Cohen. First, Plaintiffs will not suffer any prejudice if Commissioner Cohen is a witness at trial, as Plaintiffs have ample time to prepare for and depose Commissioner Cohen. See, e.g., Johnson Elec. North America, Inc. v. Mabuchi Motor America Corp., 77 F.Supp.2d 466, 458 (S.D.N.Y. 1999); McNemey v. Archer Daniels Midland Co., 164 F.R.D. 584, 587 (W.D.N.Y. 1995) ("prejudice...can be remedied by granting leave to...depose the" witness). Indeed, as the court is aware, Commissioner Cohen's deposition is scheduled for March 28, 2007.

In addition to the fact that Plaintiffs will have an opportunity to examine Commissioner Cohen prior to his testifying at trial, Plaintiffs have not offered any support for their claim that a witness such as Commissioner Cohen, who was named as a witness prior to the close of discovery and well in advance of a trial date, should be precluded. Indeed, all of the cases cited by Plaintiffs in support of their motion to preclude Commissioner Cohen are inapposite, as they involve the final disclosure of relevant witnesses and/or documents after the close of discovery, and often on the very eve of trial.[5] For instance, in the case relied on most heavily by Plaintiffs, Shred-It USA, Inc. v. Confidential Shredding, LLC, 2005 WL 2290448, *1 (E.D.N.Y. Sept. 20, 2005), the three witnesses precluded by the court were first identified in counsel's Second Amended Joint Pre-Trial Order. Similarly, in Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006), the precluded witnesses were disclosed a mere ten days prior to trial. In the instant case, Plaintiffs concede that these matters are not "trial ready" and there would be no prejudicial impact on trial, since Commissioner Cohen's deposition is scheduled well in advance of any possible trial date. (Letter from Christopher Dunn dated February 2, 2007 at 8.) With regard to the issue of summary judgment, Plaintiffs have just recently adjusted the schedule for dispositive motion practice so that their Summary Judgment Motion is due April 30th. Since Commissioner Cohen's deposition has been scheduled over a month in advance (March 28th, 2007), Plaintiffs will not suffer any prejudice with regard to their summary judgment motion. Given that a trial date in these matters is not set, the fourth factor under Softel clearly weighs against precluding Commissioner Cohen

**II.**    **Defendants Should Not Be Precluded From Relying Upon Intelligence Documents At Trial**

Similar to the question of whether to preclude the testimony of Commissioner Cohen, the Court should consider the four factors set out in Softel when considering whether to preclude the Intelligence

---

[5] See Design Strategies, Inc. v. Davis, 469 F.3d 284 (2d Cir. 2006) (expert witness disclosed after issuance of pre-trial order was precluded), Patterson v. Balsamico, 440 F.3d 104 (2d Cir. 2006) (discussed infra), Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99 (2d Cir. 2002) (emails not produced in time for trial warranted an adverse inference instruction), Softel, Inc. v. Dragon Med. & Sci. Comms., Inc., 118 F.3d 955 (2d. Cir. 1997) (expert witness report provided after close of discovery was precluded), Shred-It U.S.A., Inc. v. Confidential Shredding, L.L.C., 2005 WL 2290448 (E.D.N.Y. Sept. 20, 2005) (discussed infra), Silivanch v. Celebrity Cruises, Inc., 171 F.Supp.2d 241 (S.D.N.Y. 2001) (discussed infra).

Documents. Those factors are: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Softel, Inc.,118 F.3d at 961 (citing with approval Outley v. City of New York, 837 F.2d 587, 590-91 (2d Cir. 1988)). As with Commissioner Cohen, the factors weigh against preclusion and Plaintiffs' request should be denied.

First, contrary to Plaintiffs' characterization, Defendants produced the Intelligence Documents in response to the only discovery request that called for such documents and, as such, produced them in a timely manner. Second, the Intelligence Documents play a central role in Defendants' case and Defendants' chances of success would be adversely affected by their preclusion. Finally, as with the testimony of Commissioner Cohen, Plaintiffs cannot demonstrate how they would suffer any prejudice from the admission of the Intelligence Documents, as they would have ample time to review the Intelligence Documents and conduct any additional discovery they deem necessary.

### A. Defendants Complied With The Federal Rules And Produced The Intelligence Documents In A Timely Manner

Contrary to Plaintiffs' characterization, Defendants did produce the aforementioned Intelligence Documents in a timely manner. First, Plaintiffs are simply wrong in their description of Defendants' prior discovery responses. In response to Document Requests 41 and 43 in the Schiller and Dinler matters, respectively, Defendants did not, as Plaintiffs claim, state that they were searching their files for responsive documents nor did they state they would produce any documents. As is clear in Defendants' Responses, including the copies attached as Exhibits 10 and 11 to the Dunn Declaration, Defendants' responses were limited to a number of objections concerning the scope and subject matter of the Request. Significantly, Plaintiffs never took issue with Defendants' responses nor did they ever move to compel the production of any documents they believed were called for by those requests.

On October 5, 2006 – almost 18 months after Defendants objected to Requests Number 41 and 43, Plaintiffs served Defendants with their Fourth Supplemental Interrogatory and Document Request (Interrogatory 35 and Document Request 84, hereinafter "the New Requests"). In the New Requests, Plaintiffs asked Defendants to identify any documents that had been produced in response to Requests 41 and 43. Plaintiffs also, for the first time, included in the New Requests a call for "documents that contain, discuss, or refer to any intelligence." [6] Prompted by this new reference to documents that contain, discuss, or refer to any intelligence, and by the fact that, in deposition testimony provided subsequent to Requests Numbers 41 and 43, witnesses such as Chief Esposito had identified intelligence information and discussions about such information as providing part of the basis for the RNC fingerprinting policy, Defendants identified and produced the documents currently at issue.

---

[6] Interrogatory Number 35 was the first request in which Plaintiffs called for the production of such documents. Similarly, Document Request Number 84 is the first in which Plaintiffs request any documents relied upon by Defendants as a basis for the Defendants' no-summons policy during the RNC.

It is inaccurate to assert, as Plaintiffs do, that Defendants had at any point prior to their responses to the October 5, 2006 Discovery Requests, responded to Requests Numbers 41 and 43 in any way other than to object to them as inappropriate Requests. Indeed, even in Defendants' response to Interrogatory Number 35 Defendants stated the manner in which they were interpreting the interrogatory since it was still not clear exactly what documents were called for by the confusing language of the interrogatory. See Defendants' Responses and Objections to Plaintiffs' Fourth Supplemental Interrogatory and Document Request dated January 19, 2007, annexed as Exhibit 13 to Dunn Declaration.

Plaintiffs also cite requests 19 and 22 in the Schiller and Dinler matters, respectively, as requests which called for the documents currently at issue.[7] Those requests called for the production of documents "reflecting all justifications for policies, procedures, directives, or practices concerning the NYPD's processing of individuals arrested at RNC-protest events." Defendants asserted a number of objections to these requests. See Exhibits 10 and 11 to Dunn Declaration. As with requests 41 and 43, Plaintiffs never took issue with Defendants' responses nor did they seek to compel any documents in response to these requests. As is clearly set forth in Defendants' response to Interrogatory Number 35, Defendants have not identified the Intelligence Documents as responsive to Document Requests 19 and 22. Rather, the documents have been identified in response to the New Requests. In addition, Defendants' response to Document Request Number 84 specifically identified the Intelligence Documents as "containing facts related to the non-issuance of summonses to persons arrested in conjunction with the RNC." See Exhibit 13 to Dunn Declaration. Despite Plaintiffs' assertions, Defendants have not altered in any way their original interpretation of Documents Requests 19, 22, 41, or 43. As such, the Intelligence Documents were produced in a timely manner in response to the Requests served in October 2006 and should not be precluded.

### B.    The Intelligence Documents Are Central To Defendants' Case

Assuming, *arguendo*, that the Intelligence Documents were called for by Plaintiffs' previous discovery requests (which Defendants do not concede), the factors outlined in Softel make clear that the inquiry as to whether or not preclusion is appropriate does not end with the timeliness of a production. Rather, the Court must also inquire into several other factors, the second of which is the importance of the documents in question to the Defendants' case. Softel, 118 F.3d at 961. Similar to the impact of Commissioner Cohen's testimony on Defendants' case, the Intelligence Documents are equally important, as they detail what information the NYPD relied upon in formulating its policies. As Chief Esposito testified in his deposition before Mr. Dunn as well as other Plaintiffs' counsel, the decision to adopt a policy such as the no-summons policy implemented at the RNC often results from intelligence information regarding the intended behavior of individuals planning on attending the particular event. In the case of the RNC, Chief Esposito testified in response to Mr. Dunn's own questions that the NYPD had such intelligence prior to the RNC. These Intelligence Documents contain that information, and form a basis for the policies adopted that are now at issue in this litigation. Therefore, for the reasons explained above, the Intelligence Documents should not be precluded.

---

[7] In their letter dated February 2, 2006, Plaintiffs refer to Document Request Number 19 in Schiller yet the request actually quoted in the letter, and the request which mirrors request number 22 in Dinler, is request number 20. Defendants assume this is the request to which Plaintiffs were referring.

Plaintiffs claim that the fact that these documents are so important to Defendants' case highlights the prejudice they would suffer if they are not precluded. However, any claim of prejudice should be judged only in relation to the potential prejudice suffered by the other party. In this case, the Court should consider the relative import of the Intelligence Documents to the litigation and the impact on both parties should the documents be precluded. See Design Strategy, Inc., 469 F.3d at 297. While it is clear that the preclusion of the Intelligence Documents would significantly impact Defendants' ability to defend itself at trial, the relative prejudice to Plaintiffs due to their admission would be minimal, and most certainly outweighed by the impact upon Defendants, as Plaintiffs will have ample opportunity to pursue their claims against Defendants by examining the Intelligence Documents and requesting to conduct additional discovery they deem necessary. Precluding the Intelligence Documents, on the other hand, would leave Defendants with no other means by which to present this type of information at trial and would thus deprive Defendants of the ability to fully defend themselves against Plaintiffs' allegations. Therefore, the harm to Defendants under the third Softel factor should weigh against preclusion. See Outley, 837 F.2d at 591 ("before the extreme sanction of preclusion may be used . . .a judge should inquire more fully into the actual difficulties which the violation causes, and consider less drastic responses.")

## C.   Plaintiffs Cannot Demonstrate They Would Suffer Any Prejudice

As previously discussed, *supra*, the final two factors the Court should consider under Softel when weighing a decision to preclude evidence is "the (3) prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Softel, 118 F.3d at 961. As with the testimony of Commissioner Cohen, both of these factors weigh against the preclusion of the Intelligence Documents. First, Plaintiffs clearly have time to review the documents and prepare to address them prior to their introduction at trial.[8] In fact, Plaintiffs have already indicated to Defendants that they wish to recall Chief of Department Joseph Esposito for questioning regarding these documents should they not be precluded. Defendants agree to produce Chief Esposito for this limited inquiry.[9] Furthermore, Plaintiffs' claim that they were unaware until January 17, 2007 that Defendants planned to produce these documents is simply false. Defendants had informed Plaintiffs on numerous occasions, including through telephone conversations and email, that they intended to produce intelligence-related documents in response to the New Requests. Defendants never attempted to hide the fact that these were documents that were being produced for the first time in these litigations.[10] At no point prior to the production of these documents did Plaintiffs allege that they had an issue with either the timing of the

---

[8] Indeed, it is apparent that Plaintiffs have already had enough time to review the Intelligence Documents with enough scrutiny to challenge Defendants' designation of the documents as confidential and to alert the media to their existence. See February 8, 2007 Letter from Christopher Dunn to Peter Farrell and copied to David McCraw, Esq., of the New York Times attached at Exhibit 4.

[9] Other than Commissioner Cohen, Chief Esposito is the only individual Plaintiffs have cited as necessary to depose based upon Defendants' production of the Intelligence Documents.

[10] Emails and correspondence from Defendants informing Plaintiffs of their intent to produce the intelligence documents are attached at Exhibit 5.

9

production or the subject matter of the documents. It is only now that they have reviewed their contents and recognize that the intelligence contained therein warranted defendants' policies do they belatedly seek to preclude them.

III.    **CONCLUSION**

Despite Plaintiffs' assertions, Defendants have complied with the Federal Rules of Civil Procedure with respect to both Commissioner Cohen and the Intelligence Documents, as both were identified in a timely manner. Plaintiffs cannot claim that they were unaware of the existence of Commissioner Cohen as a potential witness, as he was identified through deposition testimony as early as 2005 and is an individual that was central to the NYPD's efforts to collect intelligence information prior to the RNC. The deposition testimony also indicates that this intelligence information helped provide the basis for the adoption of several policies during the RNC such as the fingerprint and summons policies. Similarly, and contrary to Plaintiffs' misrepresentations of the history of this particular issue, the Intelligence Documents produced in response to Plaintiffs' Fourth Supplemental Interrogatory and Document Request were produced in a timely manner. In neither case will Plaintiffs suffer any prejudice from their inclusion, as Plaintiffs have ample time to examine the documents as well as depose Commissioner Cohen. In contrast, the preclusion of either Commission Cohen or the Intelligence Documents would severely impact Defendants' chances at trial, as both are central to their case. As a result, Plaintiffs' request for preclusion should be denied.

Respectfully Submitted,

Gerald S. Smith (GS-9911)
Assistant Corporation Counsel

Cc:  Christopher Dunn, Esq. (by electronic mail)

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDS SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____               │
│ DATE FILED: __11/28/07__             │
└─────────────────────────────────────┘
```

--------------------------------------------------

HACER DINLER, et al.,

                     Plaintiffs,

    -v-

CITY OF NEW YORK, et al.,

                     Defendants.

No. 04 Civ. 7921 (RJS) (JCF)
ORDER

--------------------------------------------------

MICHAEL SCHILLER, et al.,

                     Plaintiffs,

    -v-

CITY OF NEW YORK, et al.,

                     Defendants.

No. 04 Civ +. 7922 (RJS) (JCF)
ORDER

--------------------------------------------------

RICHARD J. SULLIVAN, District Judge:

      On August 27, 2007, defendants in the above-entitled actions filed an appeal of a ruling by the Honorable James C. Francis, Magistrate Judge, dated August 6, 2007, wherein Judge Francis ordered defendants to produce certain redacted documents regarding intelligence operations by the New York City Police Department. By letter dated August 31, 2007, defendants ask the Court (1) to remand this matter to Judge Francis so that he may consider an additional declaration from Deputy Commissioner David Cohen (the "Cohen Declaration"); (2) to direct that the Cohen Declaration be submitted under seal and served in a redacted form on plaintiffs' counsel; and (3) to stay defendants' appeal pending Judge Francis' decision regarding

these issues.[1]

IT IS HEREBY ORDERED that defendants' request for a remand of these actions to Judge Francis is GRANTED. The actions are remanded for the limited purpose of deciding whether the Cohen Declaration requires reconsideration of any part of Judge Francis' August 6, 2007 ruling.

IT IS FURTHER ORDERED that defendants' request for an order permitting defendants to file the Cohen Declaration under seal and to serve a redacted version of that document upon plaintiffs' counsel is DENIED without prejudice to defendants renewing such a request before Judge Francis.

IT IS FURTHER ORDERED that defendants' request for a stay of their appeal is GRANTED. The appeal is hereby stayed pending a decision by Judge Francis regarding these issues.

IT IS FURTHER ORDERED that counsel for all parties in the above-entitled actions shall appear for a status conference before the undersigned on January 2, 2007, at 11:00 a.m. in the United States District Court, 500 Pearl Street, New York, New York, Courtroom 21C.

SO ORDERED.

DATED:     New York, New York
           November 28, 2007

                                        RICHARD J. SULLIVAN
                                        UNITED STATES DISTRICT JUDGE

---

[1] These cases were originally assigned to the Honorable Kenneth M. Karas, District Judge. The cases were reassigned to the undersigned on October 2, 2007.

# EXHIBIT C

# When Activists Are Terrorists

A17

THE WALL STREET JOURNAL.    OPINION    Thursday, May 3, 2007

By Judith Miller

Did the New York Police Department spy on peaceful groups and citizens trying to exercise their constitutional right to protest the renomination of President Bush at the Republican National Convention in the summer of 2004? This is what civil liberties groups allege, and what the NYPD denies. Who is right?

The issue is at the heart of several interrelated suits being adjudicated in federal district courts in New York, many of them filed on behalf of the 1,800 protesters who were arrested during the largest protest at a political convention in American history. In its complaints, the New York Civil Liberties Union, which represents seven of those arrested, accuses the department of having violated the law by its mass arrests, holding people in protracted custody for minor violations, and fingerprinting those detained.

While the complaints themselves do not accuse the police of monitoring citizens for their political views, Christopher Dunn, the civil liberties group's associate legal director, said that there were "many indications" that the police had investigated people who posed no threat either to the city or the convention. The allegation was echoed in a front-page, 2,500-word article that led the New York Times in late March. Based partly on his review of more than 600 pages of the NYPD's still-secret "raw intelligence documents" and "summary digests of observations from both the field and the department's cyberintelligence unit," reporter Jim Dwyer concluded that the NYPD's "R.N.C. Intelligence Squad" had chronicled the views and plans of people who had "no apparent intention of breaking the law."

### The NYPD, surveillance and the 2004 GOP convention.

Stung by the criticism, Police Commissioner Raymond W. Kelly, David Cohen, the deputy police commissioner for intelligence, and Paul J. Browne, the NYPD press spokesman, outlined in interviews last week the nature of the police's concerns, its conduct, and the goals of its intelligence surveillance effort that they told the Times and still argue enabled some 800,000 people to protest peacefully and helped keep New York safe. "The department was indifferent to the political views of the attendees," said Mr. Cohen, a former senior official at the Central Intelligence Agency. "The pre-convention surveillance was aimed solely at maintaining civil order."

The outcome of these disputes has important ramifications, and not just for New York's efforts to identify and prevent terrorist and other threats to the city. It also risks tarnishing what the NYPD thinks should be regarded as a tremendous achievement.

What Mr. Cohen called the "co-mingled threat" of "terrorism, anarchist violence and unlawful civil disobedience" drove both the surveillance program and the policies of mass arrests and blanket fingerprinting. He said that there was no special "squad" to provide political intelligence for the convention, as the Times reported.

The 600-plus pages of still-secret intelligence documents that this reporter has also reviewed do list numerous peaceful organizations and individuals planning to attend the protests, including as the Times accurately noted, three New York City elected officials, street theater companies, church groups and antiwar organizations, environmentalists, and people opposed to the death penalty and other Republican policies. The documents also chronicle some seemingly innocuous planning for the protests—such as the concerts being held in several cities by the satirical performance troop, Billionaires for Bush—as well as legal training and other services that similar groups and individuals were providing, or planning to provide, protesters.

But the material this reporter read does not show that the police monitored such peaceful groups and individuals because they opposed their political views, and the police say groups like "Billionaires for Bush" were never infiltrated. Rather, the intelligence documents appear focused mainly on estimating the number and motivations of people who were planning to attend the convention, as well as potential threats to the gathering, its delegates and the police.

The raw intelligence files also focus on often innovative nonviolent and violent disruption techniques that were discussed at public meetings and on the internet by more than 35 groups and coalitions planning protests at the convention, several of which have histories of violent activity at earlier demonstrations.

The courts will eventually decide whether such surveillance and policies derived from it were legal and appropriate. But my reading of the 600 pages of intelligence reports, coupled with interviews of senior police officials, a review of speeches, and documents involving the law suits, suggests that the department's surveillance effort was largely threat-driven. It was prompted by legitimate concerns about how to assure the safety of both New Yorkers and protestors, 65% of whom came from outside the state.

While the line between appropriate and illegal surveillance of political groups is not always obvious or as a matter of law clearly drawn, the police complain that the department's actions have not been framed in the context of the threat New York was facing.

In an interview, Mr. Cohen argued, for instance, that a balanced appraisal of the city's surveillance effort should have emphasized the "ongoing and continuous threat" confronting the police. Since 9/11, he said, the city has experienced or prevented 11 separate terrorist plots, roughly two a year—beginning with the still-unsolved anthrax letter attacks of October, 2001, in which five people died (one in Manhattan), to the thwarting of a plot in July 2006 to destroy the PATH subway linking New Jersey to Lower Manhattan and blow up the retaining wall at Ground Zero to flood lower Manhattan.

The 18-month period between the selection of New York and the convention itself was "the most intense threat period of the post September 11 era to date," Mr. Cohen said. Six terrorist attacks by al Qaeda-related or inspired groups in far-flung Casablanca, Jakarta, Istanbul, Moscow and Madrid killed nearly 300 people and wounded more than 3,000 during that period.

The police also had to expect and prepare for the worst because of the violence surrounding earlier large protests since 1999. "Inadequate advance understanding, or knowledge of the plans and intentions of those prepared to commit violence, undermined earlier efforts to contain disruptions," Mr. Cohen said. At Seattle's WTO protest in 1999, for instance, a relatively small group of activists among crowds of at least 50,000 people triggered grotesque mayhem—violent confrontations with the police, $3 million in property damage, and numerous injuries and arrests.

Mr. Cohen said, and his intelligence files suggest, that the police were concerned about four categories of protesters: anarchists and others openly committed to violently shutting down the city; a second, far-larger group intent on acts of civil disobedience to disrupt proceedings through peaceful if illegal means; individuals with criminal histories embedded in both these groups; and people who had previously tried to foil or alter their identities when arrested. It was the need to ascertain true identities, he said, that led to the decision to fingerprint those arrested. This, in turn, required the police to arrest demonstrators who were violating the law, rather than give them summonses, since people are fingerprinted only after an arrest.

Eight weeks before the convention, activists designated Aug. 31, 2004, in online postings as a day for civil disorder, the "Day of Chaos," or "A-31." Groups of anarchists began identifying protest targets in public advisories, press releases and on Web sites.

For many, Madison Square Garden, the convention site, was "ground zero," which activists discussed entering with false identification. Others planned to prevent delegates from reaching the convention by blinding bus driver windows or disabling charter buses, lying under vehicles, and using rented cabs and flotillas of bicycles to clog bus routes.

A least 24 hotels throughout the city hosting state delegations were identified on Web sites as delegation hosts at which protestors could converge to harass delegates and disrupt normal hotel business. Reinforced police presence at the Warwick, the Westin and Roosevelt, Commissioner Kelly said in a 2004 speech, prevented demonstrators from "rushing" the delegates' hotels.

The intelligence files show that activists had also planned, and later attempted unsuccessfully, to close down Wall Street, disrupt traffic at Herald Square and elsewhere, crash delegate parties, stage sit-ins in hotel and office lobbies, seal off subway stations with arrest tape and switch subway signs to disorient delegates. There were plans to vandalize retail stores like Starbucks and McDonalds with what Mr. Cohen called "brick and bomb tactics"; activists were also urged to disrupt Broadway performances attended by delegates on Aug. 31, designated as "Chaos on Broadway."

Other businesses seen as hostile to the activists' agenda—the Carlyle Group, Chevron, the Rand Corporation and Hummer of Manhattan—were designated for "direct actions" ranging from blocking entrances to breaking windows and setting fires. The files showed that activists with previous arrests for violent conduct were monitored by NYPD plain-clothes detectives, and that information about their convention plans was shared with police departments in other states and counties.



Activists discussed the use of disruptive tactics that had worked so well in Seattle—Molotov cocktails, ammonium-nitrate bombs with nails, five CS canisters, Tiki Torches (soup cans filled with flammable substances attached to the end of a stick) water guns filled with flammable liquids and chemical irritants, urine or paint, and mobile infrared transmitters to change traffic signals.

The files document at least eight training sessions in New York and outside that were organized by anarchists and other experienced activists. Techniques for evading or countering the police were taught. The New York City Anarchist Tribes, for example, held martial-arts training in Manhattan in January, 2004. The Syracuse Peace Council, in Ithaca, N.Y., which planned to block traffic in New York, held weekend training aimed at "building our own radical activist infrastructure."

The "Constitutional Rights Enforcement and Support Team," an Internet-based group, stated on its Web site that "many people who join this group will die, be wounded, or jailed" in its efforts to counter "police brutality." Ashira Affinity, a Colorado-based anarchist group, urged members to join protests that were "strategic, ruthless, efficient, as well as chaotic."

In addition to the usual crackpot threats posted in Internet chat rooms, such as the one by a writer who vowed to "fly a 767 into the convention and take care of the American problem on Thursday"—which the police nevertheless could ill afford to ignore—came vaguer if still troubling counsel from would-be protestors: "Give them the New York they are afraid of," urged one listing.

In Queens, police arrested three "Black bloc" anarchists who had three imitation handguns, a butterfly knife, pellets and a map of New York City. A man arrested on Aug. 20 for criminal trespass and possession of burglary tools in the Mandarin Oriental Hotel, had been arrested more than 25 times in California for various offenses.

Critics of the police complain that never had so many protestors at a political convention been arrested. But Mr. Cohen notes that the arrest of some 1,807 out of nearly 800,000 protestors is the lowest arrest-to-crowd ratio of any major political gathering. Had the arrest-to-crowd ratio at a Miami protest in November 2003 been repeated in New York, 10,000 people would have been arrested.

The convention's only serious injury, Mr. Kelly said, was sustained by a detective who was pulled from his scooter and kicked unconscious by a demonstrator. He called the police's handling of the event one of his department's "finest hours," sentiments that were incidentally shared by the Times, which editorialized soon after the convention that the "intense planning" and "well-disciplined use of force" by the police had shown how disruptive tactics could be countered.

New York's fractious history over political surveillance has entailed deep distrust between the city's police and civil libertarians. Though the Supreme Court has ruled that undercover surveillance of political groups is generally legal, the NYPD's abuses of political monitoring of anti-Vietnam war activists in the late 1960s led the courts to impose restrictions in 1985 on the department's monitoring of political protests. After the 9/11 attacks, however, the police sought and secured from the courts a loosening of those restrictions to prevent terrorism—the so-called Handschu guidelines. But as a result, what kind of political surveillance the police can conduct is once again before the courts, and in the press.

Last February, the judge who had loosened the Handschu restrictions in 2003 harshly criticized the police in a separate but related political surveillance case involving the videotaping of protests, ruling that there must be an "indication of unlawful activity" before a political group or a person's political activity can be investigated. The police have challenged that ruling on grounds that this would effectively restore the pre-9/11 limits. They fear it might also dissuade other law enforcement agencies from adopting a similar approach. In fact, the controversy is already having that effect.

That would be a pity. For although I am devoted to the First Amendment and privacy rights, and believe that affective judicial and administrative oversight is critical to preventing police abuses, I also want the NYPD to have the tools and programs to protect the city from terrorist attacks. If that means scanning the Internet and sending plainclothes officers to public meetings to learn about planned actions that might turn violent, or be infiltrated and taken over by violent dissidents, so be it. Unfortunately, the current controversy is already making other police departments wary of following the NYPD's effective tactics.

Some law enforcement officials in the Twin Cities fear there may be many arrests during the 2008 Republican convention there. But Tim Lynaugh, a police officer assigned to convention planning, said his department hopes there will be almost none. But with fewer than 600 police officers (New York has 37,000 in uniform), they will probably need outside assistance to assure public safety.

While the NYPD's advice was helpful when officers from both departments met in January to discuss preparations, police in the Twin Cities would probably not emulate New York's surveillance program prior to its own convention, even if it had the manpower to do so. "If what we've read about their program is true," Mr. Lynaugh said, "that is just not how we operate."

*Ms. Miller, a former New York Times reporter, is a writer in Manhattan.*